Argued and submitted May 6, 2003, decisions of the Court of Appeals and judgments of the circuit court affirmed June 23, 2005

STATE OF OREGON,
*Respondent on Review,*

*v.*

MARK LEE HIRSCH,
*Petitioner on Review.*

(CC 99CR2684FE; CA A109091; SC S49370)

STATE OF OREGON,
*Respondent on Review,*

*v.*

LAWRENCE AARON FRIEND,
*Petitioner on Review.*

(99CR1105FE; A108859; S49371)
(Consolidated for Argument and Opinion)

114 P3d 1104

Susan F. Drake, Deputy Public Defender, Salem, argued the cause for petitioners on review. With her on the briefs were Walter J. Ledesma, Deputy Public Defender, and David E. Groom, Public Defender.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

DURHAM, J.

---

** Kistler, J., did not participate in the consideration or decision of these cases.

## DURHAM, J.

In these two criminal cases, consolidated for purposes of review, the trial court convicted each defendant of the crime of felon in possession of a firearm, ORS 166.270(1).[1] Defendants contend that ORS 166.270(1) is facially unconstitutional because that statute infringes on the right to bear arms guaranteed under Article I, section 27, of the Oregon Constitution.[2] The Court of Appeals disagreed with that contention and, in each case, affirmed the trial court's decisions to overrule defendants' demurrers. *State v. Hirsch*, 177 Or App 441, 34 P3d 1209 (2001); *State v. Friend*, 178 Or App 157, 35 P3d 1105 (2001). We allowed review and now conclude, as did the Court of Appeals, that ORS 166.270(1) is not unconstitutionally overbroad on its face. Accordingly, we affirm the decisions of the Court of Appeals and the judgments of the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

The facts of each case are undisputed. In November 1999, while on parole for a prior felony conviction, defendant Hirsch brought a .308 caliber Winchester bolt-action rifle into a gun shop to have it bore-sighted. The police arrested him, and the state charged him with the crime of being a felon in possession of a firearm, ORS 166.270(1). Defendant demurred to the indictment on the ground that ORS 166.270(1) violated Article I, section 27. The trial court overruled the demurrer and, after a bench trial, found defendant guilty of the charged offense. Defendant appealed, and the Court of Appeals affirmed. *Hirsch*, 177 Or App at 449.

---

[1] ORS 166.270 provides, in part:

"(1) Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm, commits the crime of felon in possession of a firearm."

[2] Article I, section 27, of the Oregon Constitution provides:

"The people shall have the right to bear arms for the defence of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

The constitutional term "defence" reflects the British spelling of the word "defense."

In May 1999, Deputy Sheriff Summers stopped defendant Friend and arrested him for driving under the influence of intoxicants. Because the police intended to impound defendant's vehicle, Deputy Baimbridge conducted an inventory search. Baimbridge found a .223 caliber bolt-action rifle and several rounds of live ammunition in the vehicle. Defendant admitted to Summers that he owned the rifle and used it for hunting. Defendant was charged with, among other things, the crime of being a felon in possession of a firearm. Defendant demurred to that charge on the ground that ORS 166.270(1) violated Article I, section 27. The trial court overruled that demurrer and, after a bench trial, found defendant guilty of all charges. Defendant appealed his felon in possession of a firearm conviction, and the Court of Appeals affirmed, citing its decision in *Hirsch*. *Friend*, 178 Or App at 157.

In *Hirsch*, the Court of Appeals examined the history of the right to bear arms and the restrictions on gun ownership in precolonial England and the United States up to the adoption of Article I, section 27, of the Oregon Constitution. The court determined from that history that the drafters of the Oregon Constitution would not have understood the right to bear arms to guarantee an absolute right to the possession of arms. 177 Or App at 445-48. The court also determined that the framers would have "regarded felons as noncitizens, not entitled to the constitutional guarantee of political rights such as the franchise and the right to bear arms." *Id.* at 449. Thus, the court concluded that Article I, section 27, "does not prohibit the legislature from barring felons from possessing firearms." *Id.*

We allowed both defendants' petitions for review to determine whether ORS 166.270(1) unconstitutionally infringes on the right to bear arms set out in Article I, section 27, of the Oregon Constitution.

## II. NATURE OF CONSTITUTIONAL CHALLENGE AT ISSUE

### A. *Facial Overbreadth Challenge*

At the outset, we clarify the nature of the parties' disputes under the Oregon Constitution. Defendants contend

that ORS 166.270(1) is unconstitutionally "overbroad" on its face. Specifically, defendants argue that, although the legislature might have authority under Article I, section 27, to prohibit the possession of firearms as to certain dangerous felons, the legislature is without authority to prohibit possession categorically as to *all* felons. The state responds that, because defendants raised only facial challenges to ORS 166.270(1), they must establish that that statute is unconstitutional in all its applications. In the state's view, any such effort in that regard fails, in light of defendants' apparent concession that the legislature permissibly may limit arms possession as to certain dangerous felons. It follows, the state argues, that defendants fall short of satisfying a prerequisite to their facial challenges (that is, that the statute is unconstitutional in all its applications) and, therefore, that this court should refrain from reaching the merits of defendants' arguments respecting Article I, section 27.

■  The state is correct that, when bringing certain facial constitutional challenges to a statute, the challenger ordinarily must establish that the statute is unconstitutional in all its applications. *See Jensen v. Whitlow*, 334 Or 412, 421, 51 P3d 599 (2002); *State v. Sutherland*, 329 Or 359, 365, 987 P2d 501 (1999) (both stating principle). Where that principle applies, if the challenger is unable to establish facial unconstitutionality in that manner, then the challenger is left to argue only that the statute is unconstitutional as applied to the particular facts at hand. *See, e.g., State ex rel Kane v. Goldschmidt*, 308 Or 573, 590, 783 P2d 988 (1989) (although state-approved financing agreements did not contravene constitutional debt limitations on their face, future, unpredictable circumstances could render agreements in violation of those limitations); *Hunter v. State of Oregon*, 306 Or 529, 533-34, 761 P2d 502 (1988) (although unavailability of post-conviction relief to persons convicted of municipal ordinance violations did not in itself contravene equal privilege and immunities protections, future unequal application of ordinances to certain classes could implicate those protections).[3]

---

[3] The state correctly notes that defendants did not bring as-applied challenges to ORS 166.270(1) in these cases—that is, they did not argue that, in light of the individual circumstances of their respective crimes and backgrounds, the legislature could not constitutionally prohibit them from bearing arms in their own defense.

■■ However, defendants here do not assert that ORS 166.270(1) is unconstitutional on its face because it violates Article I, section 27, in all its applications. Rather, they particularly argue that, on its face, that statute is unconstitutionally overbroad. The term "overbreadth" connotes a particular type of facial constitutional challenge in which the challenger contends that, although a statute constitutionally could apply in some circumstances, it impermissibly, and necessarily, impinges on a constitutional guarantee in other circumstances by prohibiting conduct that is constitutionally protected. *State v. Robertson*, 293 Or 402, 410, 649 P2d 569 (1982); *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981). Unlike with other facial challenges, a challenger raising an overbreadth challenge need not demonstrate that the statute at issue is unconstitutional under the particular circumstances at hand. Rather, the challenger will prevail in his or her facial challenge if the court concludes that the statute in question prohibits constitutionally protected conduct of any kind. *See Blocker*, 291 Or at 261 ("[T]o the extent that an overbroad law forbids what may not constitutionally be forbidden, it is invalid as such without regard to the facts in the individual case.").

In short, a challenger appropriately raises a claim of overbreadth whenever a legislative enactment, in certain circumstances, purportedly contravenes a constitutional provision that delineates protected conduct. To illustrate, this court on many occasions has addressed overbreadth challenges involving Article I, section 8, of the Oregon Constitution, which delineates constitutionally protected conduct by guaranteeing the right to free expression of opinion and the right to speak, write, or print freely on any subject whatever. *See, e.g., City of Hillsboro v. Purcell*, 306 Or 547, 556, 761 P2d 510 (1988); *State v. Ray*, 302 Or 595, 733 P2d 28 (1987) (both agreeing with claims asserting overbreadth under Article I, section 8). More recently, this court also addressed an overbreadth challenge invoking both Article I, section 8, and Article I, section 26, which delineates constitutionally protected conduct by guaranteeing the right to peaceable assembly. *State v. Ausmus*, 336 Or 493, 85 P3d 864 (2004). In all the foregoing cases, the court concluded that the statutes at issue impinged on the rights guaranteed under Article I, sections 8

and 26, in certain circumstances, even though they did not necessarily do so in all circumstances. *See Ausmus*, 336 Or at 507; *Purcell*, 306 Or at 555-56; *Ray*, 302 Or at 600-01 (all so concluding). Further, consistently with the nature of over-breadth challenges, the court did not examine the particular facts of the cases before it. Rather, the court concluded in each case that the fact that the statute at issue, on its face, impinged on constitutionally protected conduct in certain circumstances compelled invalidation of the statute.

■        Like Article I, section 8, and Article I, section 26, Article I, section 27, delineates constitutionally protected conduct, by guaranteeing the right of the people to bear arms for the defense of themselves and the state. Consequently, a claim of overbreadth is appropriate when a challenger contends that, in certain circumstances, a statute impinges on that right. Indeed, this court recognized as much in *Blocker*, 291 Or at 261-62 (discussed further below), when it concluded that a statute that prohibited possession of certain types of weapons "reached beyond permissible limits to impinge on a constitutionally protected right." *Id.* at 261. Likewise, defendants here appropriately ground their challenges in the overbreadth doctrine, because they argue that ORS 166.270(1) unconstitutionally impinges on the right to bear arms in certain circumstances, even though that statute arguably could apply in a constitutional manner in other circumstances (that is, as to certain dangerous felons).

■        We clarify one further aspect of an overbreadth challenge that bears on our analysis set out below. As this court has noted before, courts may be able in some circumstances to resolve overbreadth challenges through statutory interpretation. That is, the court ultimately may determine that the legislature did not intend the statute at issue to operate with the breadth that the challenger attributes to it. *See Robertson*, 293 Or at 412 (explaining that, in some circumstances, court may save overbroad law through narrowing construction that is fully consistent with legislature's intent); *see also State v. Rangel*, 328 Or 294, 304-06, 997 P2d 379 (1999) (applying principle to criminal stalking statute in context of facial overbreadth challenge). However, for purposes of the issue before us here, the text of ORS 166.270(1) offers

no opportunity for a narrowing judicial construction: it prohibits *all* persons convicted of *any* felony under state or federal law from possessing firearms in *all* circumstances.[4]

## B. *Burden of Persuasion*

■ ■    One further preliminary matter requires mention here. The state asserts that, in bringing their facial challenges to ORS 166.270(1), defendants bear the burden of *proving* that that statute prohibits conduct that Article I, section 27, protects. We disagree. As this court has explained, "an ambiguity in the constitution or in a statute does not, by itself, create an issue of fact, let alone one that must be resolved by the presentation of evidence." *Ecumenical Ministries v. Oregon State Lottery Commission*, 318 Or 551,

---

[4] We note, as the state points out, that the legislature has limited application of ORS 166.270(1) to a certain extent by enacting subsection (4) to ORS 166.270, which provides, in part:

"Subsection (1) of this section does not apply to any person who has been:

"(a)  Convicted of only one felony under the law of this state or any other state, or who has been convicted of only one felony under the laws of the United States, which felony did not involve criminal homicide * * * or the possession or use of a firearm or a weapon having a blade that projects or swings into position by force of a spring or by centrifugal force, and who has been discharged from imprisonment, parole or probation for said offense for a period of 15 years prior to the date of the alleged violation of subsection (1) of this section; or

"(b)  Granted relief from the disability under 18 U.S.C. 925(c) or has had the person's record expunged under the laws of this state or equivalent laws of another jurisdiction."

Under ORS 166.270(4)(a), then, the legislature has exempted any person who previously committed only a single felony that did not involve criminal homicide or the use of certain weapons, and who completed a term of imprisonment or supervision for that felony more than 15 years before the possession at issue, from prosecution for being a felon in possession of a firearm. Although we proceed to analyze the guarantee set out in Article I, section 27, in light of the parties' broader framing of the issue in these cases—that is, whether the prohibition set out in ORS 166.270(1) is unconstitutionally overbroad as it applies to all felons—we are mindful of the narrow exception set out in subsection (4).

We further note that ORS 166.270(1) also offers no opportunity for a narrowing construction as to the *purpose* of the possession, because it prohibits all felons from owning or possessing any firearms without referring to the intent behind that ownership or possession. As explained below, Article I, section 27, is not implicated when the bearing of arms is for a nondefensive purpose, because the constitutional guarantee extends to only the bearing of arms for purposes of defense. Finally, although it is not at issue in these cases, the particular "arms" involved also might not implicate Article I, section 27, as this court discussed at length in *State v. Kessler*, 289 Or 359, 368-70, 614 P2d 94 (1980) (discussing meaning of term "arms" and concluding that it likely included weapons used by settlers for personal and military defense).

558, 871 P2d 106 (1994). Rather, the court's " 'sole duty * * * is to resolve the dispute in terms of the applicability of * * * the constitutional provision[ ]' " that defendants invoke, that is, Article I, section 27. *Id.* at 559 (quoting *Monaghan v. School District No. 1*, 211 Or 360, 363, 315 P2d 797 (1957) (first ellipsis in *Ecumenical Ministries*)). We proceed to that task now.

## III. SCOPE OF THE RIGHT TO BEAR ARMS UNDER ARTICLE I, SECTION 27

A. *Preliminary Discussion*

ORS 166.270(1) operates to prohibit "[a]ny person who has been convicted of a felony" under state or federal law from possessing "any firearm." Defendants assert that that prohibition renders ORS 166.270(1) unconstitutionally overbroad on its face because Article I, section 27, guarantees the right of any person to possess a firearm without regard to whether that person has been convicted of a felony.

■     Our task, then, is to determine whether Article I, section 27, protects the possession of a firearm by a person who has been convicted of a felony. To do so, we must discern the intent of the drafters of Article I, section 27, and the people who adopted it. The goal of that inquiry is "to understand the wording in the light of the way that wording would have been understood and used by those who created the provision," *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997), and to "apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise," *State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000). Our analysis consists of an examination of the text of the constitutional provision, the case law surrounding it, and the historical circumstances that led to its creation. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

■     Before proceeding, we note that we are not unmindful of the controversy surrounding the right to bear arms and the seemingly practical wisdom of prohibiting convicted felons from possessing firearms. However, as this court previously has explained, "we are not free to interpret the constitution in any way that might seem to us to be sound public policy." *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 66 n 19, 11

P3d 228 (2000). Rather, our task "is to respect the principles given the status of constitutional guarantees and limitations by the drafters[.]" *State v. Kessler*, 289 Or 359, 362, 614 P2d 94 (1980).

## B. *Construction of Article I, Section 27*

### 1. *Text*

Article I, section 27, has provided since statehood that "[t]he people shall have the right to bear arms for the defence of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]" In the context of these cases, the specific wording of Article I, section 27, raises two questions of construction: (1) whether the legislature constitutionally may exclude certain groups of persons from the constitutional guarantee; and (2) whether the guarantee extends to all, or to only some, purposes of arms possession.

We answer the latter question quickly. Article I, section 27, clearly guarantees the right to bear arms for purposes of *defense*—specifically, "for the defence of [the people] themselves, and the State." *See Kessler*, 289 Or at 371 (clarifying that the "defence of themselves" wording includes right "to possess certain arms *for defense of person and property*" (emphasis added)). Although the parties do not focus their arguments on that part of the constitutional provision, the "defence" wording nonetheless is significant, because it serves to limit the scope of the constitutionally protected conduct at issue in these cases. Specifically, Article I, section 27, precludes the legislature from infringing on the people's right to bear arms for purposes of defense, but not for purposes other than defense. It follows that Article I, section 27, does not preclude the legislature from prohibiting persons convicted of felonies—or any other persons—from owning or possessing firearms for other than defensive purposes.

We turn, then, to the central textual issue—that is, whether the phrase "[t]he people" set out in Article I, section 27, excludes felons. Defendants argue simply that the drafters' use of the broad phrase "[t]he people" demonstrates that Article I, section 27, guarantees the right to bear arms to *all*

people, without exception. The state advances two arguments in response. First, the state argues that, by using the collective wording "[t]he people," instead of the more individual word "person," the drafters intended the protection set out in Article I, section 27, to provide a *communal* right of defense through the bearing of arms, but not an individual right of defense. Alternatively, the state contends that, even if Article I, section 27, guarantees an individual right respecting the bearing of arms, the drafters of that provision nevertheless did not intend to deprive the legislature of the authority to regulate that right, including the authority to restrict certain groups of persons from exercising the right.

■ As to the state's "communal defense" argument, this court previously has resolved that question contrary to the state's position here. In *Kessler*, 289 Or at 365-68, 371, as noted above and discussed in greater detail below, the court reviewed the history of Article I, section 27, and concluded that, in addition to providing for the defense of the community as a whole, that provision also guaranteed individuals the right to defend themselves using constitutionally protected arms. *See id.* at 371 (Article I, section 27, includes right to possess certain arms for personal defensive purposes). As a contextual matter, we note that another provision in the Oregon Bill of Rights—Article I, section 9—similarly protects individual rights through use of the words "the people." *See* Or Const, Art I, § 9 ("[n]o law shall violate the right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure" (emphasis added)); *State v. Campbell*, 306 Or 157, 166, 759 P2d 1040 (1988) ("the people" wording in Article I, section 9, protects individual privacy rights). In sum, we adhere to the reading of Article I, section 27, set out in *Kessler* and therefore reject the state's argument that the drafters' use of the words "[t]he people" limited the extent of the arms guarantee to defense of the community as a whole.[5]

---

[5] We recognize, as the state notes, that other provisions of the Oregon Bill of Rights use the more individual phrases "no person," "the person," "every man," and "any citizen" to describe the nature of various constitutional guarantees. *See* Or Const, Art I, §§ 6, 7, 10, 12, 13, 20, 24 (incorporating those phrases). However, this court's constructions in *Campbell* and *Kessler* of Article I, sections 9 and 27, conclusively establish the individual nature of the rights set out in those provisions, notwithstanding the presence of the broader words "the people."

We turn to the state's argument that, notwithstanding the drafters' use of the broad phrase "[t]he people"—which, on its face, appears to extend to *all* people—the drafters nonetheless did not intend to deprive the legislature of the authority to regulate the bearing of arms, specifically the authority to exclude certain groups of persons (such as felons) from that constitutional guarantee. The text of Article I, section 27, itself is silent as to any intent respecting such authority. However, other constitutional provisions are helpful to our textual analysis, as discussed below. *See generally State v. Cavan*, 337 Or 433, 441, 98 P3d 381 (2004) (when construing text of original constitutional provision, court must consider relevant context of that provision).

We begin with Article II, section 3 (1859), which, at the time of statehood, provided:

> "No idiot, or insane person, shall be entitled to the privileges of an elector, *and the privilege of an elector shall be forfeited by a conviction of any crime which is punishable by imprisonment in the penitentiary.*"[6]

(Emphasis added.) By specifically removing persons convicted of crimes punished by imprisonment in the penitentiary, Article II, section 3 (1859), reflected an express intent on the drafters' part to exclude that group of persons from the exercise of a constitutional right—specifically, the right to vote "[i]n all elections, not otherwise provided for, by [the Oregon] Constitution[.]" Or Const, Art II, § 2 (1859). By contrast, Article I, section 27, contains no such expression of intent to exclude those convicted of a crime punishable by imprisonment in the penitentiary—the very group of persons at issue in these cases. *See generally* General Laws of Oregon, Crim Proc Code, ch I, § 3, p 441 (Deady 1845-1864) (crimes carrying penalty of imprisonment in penitentiary all deemed to be felonies). Although the state argues that the wording of

---

[6] The people have amended Article II, section 3, twice since 1859. *See* Or Laws 1943, SJR 9; Or Laws 1979, SJR 26. That section now provides:

> "A person suffering from a mental handicap is entitled to the full rights of an elector, if otherwise qualified, unless the person has been adjudicated incompetent to vote as provided by law. *The privilege of an elector, upon conviction of any crime which is punishable by imprisonment in the penitentiary, shall be forfeited, unless otherwise provided by law.*"

Or Const, Art II, § 3 (emphasis added).

Article II, section 3 (1859), supports its contention that the drafters generally did not view felons as equal to other citizens respecting certain constitutional protections, the wording of that provision actually cuts against the state's argument here: The drafters clearly knew how to exclude persons convicted of certain felonies from the exercise of certain constitutional rights and yet chose not to exclude those persons expressly from the right to bear arms. *See generally Jory v. Martin,* 153 Or 278, 288, 56 P2d 1193 (1936) (absence of wording that limited legislative action in provision at issue, in light of presence of limiting wording in other constitutional provisions, "indicates most strongly that it was not the intention of [the] framers" to limit legislature's authority respecting provision at issue).[7]

Another provision of the original constitution further supports a more expansive reading of Article I, section 27. Original Article I, section 31 (1859), provided:

"White foreigners who are, or may hereafter become residents of this State[,] shall enjoy the same rights in respect to the possession, enjoyment, and descent of property as native born citizens. *And the Legislative Assembly shall have power to restrain, and regulate* the immigration to this State of persons not qualified to become Citizens of the United States."[8]

(Emphasis added.) As to the immigration of certain persons to Oregon, then, the drafters specifically chose to grant the legislature express constitutional authority to "restrain[ ] and regulate" that practice. We further note that the drafters did not derive Article I, section 31 (1859), from any other state constitutional provision existing at the time. Rather, the drafters crafted it themselves and specifically added the passage respecting the legislature's regulatory authority during the course of the constitutional convention. *See*

---

[7] Along the same lines, the drafters of the Oregon Constitution included a "felony exception" respecting the legislative privilege from arrest. *See* Or Const, Art IV, § 9 ("Senators and Representatives in all cases, *except for* treason, *felony,* or breaches of the peace, shall be privileged from arrest during the session of the Legislative Assembly, and in going to and returning from the same[.]" (Emphasis added.)).

[8] The people repealed Article I, section 31 (1859), following legislative referral, in 1970. *See* Or Laws 1969, HJR 16 (setting out repeal referral).

Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 317-18, 321, 469 (1926) (setting out suggested amendment and approval of amendment respecting legislative authority to restrain and regulate immigration; noting that no similar or identical provisions appeared in any other state constitution).

Original Article I, section 31 (1859), is significant to our analysis here, because, in that provision, the drafters *expressly* included the same type of wording that the state asserts in these cases they incorporated *implicitly* in Article I, section 27. As with Article II, section 3 (1859), the drafters' choice of wording in Article I, section 31 (1859), demonstrates that the drafters knew how to reserve regulatory authority in the legislature within the context of the Oregon Bill of Rights but made a different choice when they drafted and approved Article I, section 27.

In sum, the text of Article I, section 27, expressly delineates a limit respecting the intended purpose of the bearing of arms (*i.e.*, for defensive purposes); however, it does not delineate any limit—or express any intention respecting legislative authority to delineate such a limit—as to the groups of persons falling within the constitutional guarantee. Other provisions of the Oregon Constitution of 1859, however, demonstrate that the drafters knew how to exclude felons expressly from the exercise of another constitutional right and also knew how to reserve express regulatory authority in the legislature respecting certain activity referred to within the Bill of Rights.

2.   *Case Law*

This court has discussed the scope of the guarantee set out in Article I, section 27, in a number of cases, which we discuss below.

In two cases, this court appears to have adopted a reading of Article I, section 27, that is consistent with the state's reading of that provision in the cases before us now. In *State v. Robinson*, 217 Or 612, 343 P2d 886 (1959), this court rejected a constitutional challenge under Article I, section 27,

to an earlier version of ORS 166.270, which, at the time, prohibited unnaturalized foreign-born persons and certain convicted felons from owning or possessing two general categories of weapons: firearms capable of concealment on the person, including pistols and revolvers; and machine guns.[9] Citing a case from the Indiana Supreme Court,[10] the court summarily concluded that Article I, section 27,

> "permits reasonable regulation of the right to bear arms and that accordingly legislation prohibiting the carrying of concealed weapons is valid. * * * It is our belief that ORS 166.270, *at least so far as ex-convicts are concerned,* is valid legislation."

217 Or at 619 (emphasis added). In the course of reaching that decision, the court also cited "the police power of the state" as an appropriate basis for the statutory restriction:

> "It is a well-recognized function of the legislature in the exercise of the police power to restrain dangerous practices and to regulate the carrying and use of firearms and other weapons in the interest of public safety."

*Id.* at 618 (internal quotation marks omitted).

In *State v. Cartwright*, 246 Or 120, 418 P2d 822 (1966), *cert den*, 386 US 937 (1967), this court again upheld an earlier version of ORS 166.270,[11] in the context of an as-applied constitutional challenge to that statute. Citing *Robinson*, the court first stated that,

> "notwithstanding Article I, [s]ection 27, the state, in the exercise of the police power, may provide that the ownership or possession of certain firearms by an exconvict is a

---

[9] ORS 166.270 (1957), *amended by* Or Laws 1975, ch 702, § 1, provided, in part:

"Any unnaturalized foreign-born person or any person who has been convicted of a felony against the person or property of another or against the Government of the United States or of this state, or of any political subdivision of this state, who owns, or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person, or machine gun, shall be punished upon conviction by imprisonment in the penitentiary * * *."

[10] As discussed further below, the drafters of the Oregon Constitution derived Article I, section 27, from Article I, sections 32 and 33, of the Indiana Constitution of 1851.

[11] The 1965 version of ORS 166.270 at issue in *Cartwright* was identical to the 1957 version at issue in *Robinson*, set out above, 338 Or at 637 n 9.

public offense; for the [l]egislature might reasonably conclude that, in the generality of cases, a person who had demonstrated his disregard for the laws of society by committing a felony against the person or property of another would be more likely than others to resort to force and violence and would be a greater threat to the public safety when in possession of a concealable firearm than when not."

*Cartwright*, 246 Or at 135. The court next agreed with the defendant that "there may be innocent possession of a concealable firearm by an exconvict," *id.*, and suggested that the legislature might not have authority to criminalize arms possession in certain defensive circumstances, citing *Hutchinson v. Rosetti*, 24 Misc 2d 949, 205 NYS 2d 526 (1960) (holding ordinance that prohibited discharge of firearms within city limits inapplicable to defendant who fired into ceiling to scare off would-be assailants). However, the court ultimately concluded that the version of ORS 166.270 at issue was not unconstitutional as applied in the defendant's circumstances because the defendant had not been "faced with a sudden onslaught and immediate threat of great bodily harm or possible death." *Id.* at 136. The court explained that the defendant—who purportedly had possessed a pistol in his home to defend against a forewarned robbery attempt—instead could have utilized methods of defense that the statute did not proscribe, such as using a rifle or a shotgun, or notifying the police. *Id.*

As noted, in both *Robinson* and *Cartwright*, this court grounded its conclusions that the statutory prohibition at issue did not contravene Article I, section 27, in the "police power" doctrine, which generally seeks to determine whether a legislative enactment reasonably "is in the interests of the public health, safety, and general welfare." *Christian et al. v. La Forge*, 194 Or 450, 462, 242 P2d 797 (1952). However, this court in more recent years has explained that any constitutional notion of the "police power" does not refer to an independent source of legislative power itself; rather, it merely represents the legislature's general plenary power to legislate. *Dennehy v. Dept. of Rev.*, 305 Or 595, 604 n 3, 756 P2d 13 (1988); *see also Eckles v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988), *cert dismissed*, 490 US 1032 (1989) ("[T]he

'police power' is indistinguishable from the state's inherent power to enact laws and regulations; the existence of that power cannot explain the extent to which the power is constitutionally limited."). The court similarly has clarified that "the state cannot avoid a constitutional command by 'balancing' it against another of the state's interests or obligations, such as protection of the 'vital interests' of the people"; rather, any constitutional limitations on the state's actions "must be found within the language or history" of the constitution itself. *Eckles*, 306 Or at 399.

It follows that this court's ultimate conclusions in *Robinson* and *Cartwright*, respecting the legislature's authority to prohibit certain groups of persons (there, certain felons) from possessing certain types of firearms, erroneously relied on the notion of "police power" as a source of constitutional authority for legislative enactments. In that respect, then, those cases were wrongly analyzed. However, the court's decision in *Cartwright* as to the scope of the guarantee set out under Article I, section 27, is helpful to the extent that it confirms that the guarantee is limited to purposes of defense. The court in *Cartwright* further suggested— although it came far from holding—that the legislature might not have authority to criminalize possession of arms in certain defensive circumstances.[12]

This court next examined Article I, section 27, in *Kessler*, 289 Or 359. The defendant in that case challenged his conviction under *former* ORS 166.510(1) (1979), *repealed by* Or Laws 1985, chapter 709, section 4, which, among other things, prohibited any person from possessing a "slugging weapon." 289 Or at 361.[13] The state had charged and convicted the defendant under that statute after the police had found two billy clubs in his home.

---

[12] As noted above, in *Cartwright*, 246 Or at 136, the court suggested that the defensive circumstances to which Article I, section 27, applied were limited to circumstances involving "a sudden onslaught and imminent threat of great bodily harm or possible death." However, this court's subsequent extensive analysis and ultimate decision in *Kessler*, 289 Or at 371, discussed later in the text, appears to have recognized broader protection respecting the defensive circumstances in question in declaring that Article I, section 27, protects the right "to possess certain arms for defense of person *and property*." (Emphasis added.)

[13] *Former* ORS 166.510 (1979) provided, in part:

The court in *Kessler* first discussed the origins of Article I, section 27, noting that it shared a common historical background with other state constitutional arms provisions drafted in the Revolutionary and post-Revolutionary War era. *Id.* at 363. In the court's view, that common background suggested three likely purposes of the Oregon guarantee: the historical preference for a citizen militia; "the deterrence of government from oppressing unarmed segments of the population"; and, as noted earlier, the protection of the individual's right to bear arms to defend his or her person and home. *Id.* at 366-67. The court further determined that the term "arms" was intended to include "those weapons used by settlers for both personal and military defense * * * [but] would not have included cannon or other heavy ordnance not kept by militiamen or private citizens." *Id.* at 368.

After generally concluding that Article I, section 27, "includes a right to possess certain arms for defense of person and property," *id.* at 371, the court in *Kessler* held that that constitutional provision protected the defendant's possession of the billy clubs, after concluding that a billy club qualified as the type of weapon "commonly used for personal defense" at the time that the people adopted Article I, section 27, *id.* at 372. The court narrowed its ultimate conclusion, however, to the particular circumstances of the case before it, specifically holding that Article I, section 27, protected defendant's possession of billy clubs in his home.[14]

---

"(1) Except as provided in ORS 166.515 or 166.520, any person who manufactures, causes to be manufactured, sells, keeps for sale, offers, gives, loans, carries or possesses an instrument or weapon having a blade which projects or swings into position by force of a spring or other device and commonly known as a switch-blade knife or an instrument or weapon commonly known as a blackjack, slung shot, billy, sandclub, sandbag, sap glove or mental knuckles, or who carries a dirk, dagger or stiletto commits a Class A misdemeanor."

The court in *Kessler* noted that the term "slugging weapon" was used in the complaint filed in the case, although the statute itself did not use that term. 289 Or at 361 n 1. The legislature repealed *former* ORS 166.510 (1979) in 1985. Or Laws 1985, ch 709, § 4.

[14] We note that the court in *Kessler* did not specifically mention whether the defendant had challenged *former* ORS 166.510 (1979) as unconstitutional on its face or as applied to his particular circumstances. The court's opinion generally analyzes the statute from the perspective of a facial challenge; however, the court limited its ultimate conclusion to the particular circumstances of the defendant's case (that is, possession of protected arms in the home).

In *Blocker*, 291 Or 255, this court addressed a defendant's challenge to the same statute at issue in *Kessler*, involving a conviction for possession outside the home of a weapon qualifying as a billy club.[15] The court repeated its analysis from *Kessler* regarding the premise that Article I, section 27, guaranteed the right of a person "to bear arms for defense of self" and noted that the wording of Article I, section 27, contained no limit or qualification respecting the location of the weapon at issue. *Id.* at 258-59. The court further noted, citing *Kessler*, that legislation that restricts the manner of possession or use of certain weapons constitutionally may be permissible under Article I, section 27.[16] *Id.* at 259. However, the court clarified that Article I, section 27, prohibited the legislature from enacting "a total proscription of the mere possession" of "arms" that Article I, section 27, protects. *Id.* at 260. The court concluded that, as in *Kessler*, the statute at issue ran afoul of Article I, section 27, for that reason. *Id.*

As noted earlier in this opinion, the court in *Blocker* then clarified the nature of the defendant's particular constitutional challenge, in which he had argued that the statute at issue was "vague and overbroad." *Id.* (internal quotation marks omitted). After explaining the difference between the vagueness and overbreadth doctrines, the court stated:

> "[D]efendant's attack on [*former*] ORS 166.510 [(1979)] as 'overbroad' impliedly asserted that [the statute] reached beyond permissible limits to impinge on a constitutionally protected right. This could only be the right to bear arms,

---

[15] Specifically, the weapon at issue in *Blocker* was a wooden object that, purportedly, originally had been intended for use as a lamp base; the defendant acknowledged that he had possessed it with intent to use it to strike people who harassed him. 291 Or at 258.

[16] In that regard, the court cited "regulatory" statutes that prohibited the possession of a dangerous weapon with intent to use it unlawfully, the carrying of a concealed weapon, and the carrying of a concealed firearm without a license. *Blocker*, 291 Or at 259-60. The court also cited discussion from *Kessler*, which specifically had noted this court's decision in *Cartwright*, 246 Or 120 (upholding statute prohibiting certain felons from possessing certain firearms), and the Idaho Supreme Court's decision in *State v. Hart*, 66 Id 217, 157 P2d 72 (1945) (upholding statute prohibiting carrying of concealed weapons). *Blocker*, 291 Or at 259 (citing *Kessler*, 289 Or at 370)). As explained earlier in this opinion, this court based its ultimate conclusion in *Cartwright* on an understanding of the "police power" doctrine that the court since has abandoned.

although its source was not identified, as it should have been. * * *

"[W]e conclude that it is proper for us to consider defendant's 'overbreadth' attack to mean that the statute swept so broadly as to infringe rights that it could not reach, which in this setting means the right to possess arms guaranteed by [Article I, section] 27."[17]

*Blocker*, 291 Or at 261-62.

Finally, in *State v. Delgado*, 298 Or 395, 692 P2d 610 (1984), this court again addressed a constitutional challenge to *former* ORS 166.510(1) (1983), *repealed by* Or Laws 1985, chapter 709, section 4.[18] That case concerned an overbreadth challenge involving the possession of a switch-blade knife—which the defendant purportedly had carried "for protection"—discovered during a patdown search. 298 Or at 397-98. The court noted at the outset that, in the context of an overbreadth challenge such as the one at issue before it, the court "[o]rdinarily * * * would have no reason to go beyond the facts described in the accusatory instrument to resolve whether error was committed in overruling defendant's demurrer." *Id.* at 398 n 2. In light of the factual record before it, however, the court chose to note that, in the particular circumstances at hand, "there [was] no evidence to support any possible charge of an illegal intent to use the weapon or an illegal use of the weapon." *Id.*

Applying *Kessler* and *Blocker*, the court in *Delgado* ultimately concluded that the switchblade knife in question qualified as an "arm" that Article I, section 27, protected and that the statute that prohibited the mere possession or carrying of a switchblade knife therefore was facially unconstitutional. *Id.* at 403-04. In so holding, the court again emphasized that "this decision does not mean individuals have an unfettered right to possess or use constitutionally protected

---

[17] In concluding that it was appropriate to develop defendant's overbreadth challenge for him, the court specifically noted that it had decided *Kessler* after the defendant's case in *Blocker* had been tried and appealed, and that the Court of Appeals had held *Blocker* for this court's disposition in *Kessler*. *Blocker* 291 Or at 261. By contrast, defendants in these cases specifically rely on *Blocker* to argue that ORS 166.270(1) is unconstitutionally overbroad.

[18] *Former* ORS 166.510(1) (1983) was identical to the earlier versions of that statute at issue in *Kessler* and *Blocker*.

arms in any way they please. The legislature may, if it chooses to do so, regulate possession and use." *Id.* at 403.

In sum, then, this court has held that Article I, section 27, generally precludes the legislature from prohibiting the mere possession of constitutionally protected arms by "any person" but also has noted that the legislature permissibly may regulate the manner of possession and the use of constitutionally protected arms. Further, although the court in *Cartwright* ultimately rejected the defendant's as-applied challenge, the court intimated in that case, without so holding, that the right to bear arms may extend to certain defensive situations, even in the case of possession by a felon. Finally, the court's holdings in *Robinson* and *Cartwright* suggest that the legislature permissibly may prohibit the mere possession of a constitutionally protected weapon based on one's status as a felon, although this court has abandoned the "police power" rationale underlying those cases.

### 3. *Historical Circumstances*

#### a. *Oregon Constitutional Debate, Indiana Constitutional Debate, and Other State Constitutional Provisions*

As to the adoption of Article I, section 27, itself, the historical evidence of the drafters' intent—or of the people's intent in adopting the Oregon Constitution of 1859—is limited. There are no reported debates on that provision from Oregon's constitutional convention, and the convention delegates adopted it as the drafters originally proposed it. Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I & II)*, 37 Willamette L Rev 469, 545-46 (2001).

As this court explained in *Kessler*, 289 Or at 363, the drafters of the Oregon Constitution derived Article I, section 27, almost verbatim from Article I, sections 32 and 33, of the Indiana Constitution of 1851.[19] W.C. Palmer, *The Sources of*

---

[19] Article I, section 32, of the Indiana Constitution of 1851 provided that "[t]he people shall have a right to bear arms for the defence of themselves and the State."

Article I, section 33, of the Indiana Constitution of 1851 provided that "[t]he military shall be kept in strict subordination to the civil power."

*the Oregon Constitution*, 5 Or L Rev 200, 202 (1926). The convention debate respecting the adoption of the Indiana Constitution of 1851 sheds some light on the question whether or not the wording that the people of Oregon eventually adopted as Article I, section 27, implicitly deprived the legislature of the authority to regulate the bearing of arms. *See generally Armatta v. Kitzhaber*, 327 Or 250, 265, 959 P2d 49 (1998) (although not as helpful as history or case law revealing the intent of framers of Oregon Constitution, information demonstrating intent of framers of Indiana Constitution of 1851 can be instructive when interpreting Oregon constitutional provision patterned after Indiana Constitution).

By way of background, Article I, section 20, of the Indiana Constitution of 1816 contained an arms provision that is virtually identical to Article I, section 27, of the Oregon Constitution.[20] In 1833, the Indiana Supreme Court held that it was permissible under that 1816 provision for the state legislature to prohibit the wearing or carrying of concealed weapons. *State v. Mitchell*, 3 Blackf 229 (Ind 1833).

At the 1850 Indiana constitutional convention, a standing committee proposed revised wording for that state's arms provision; as originally introduced, the revised guarantee would have provided that "[n]o law shall restrict the right of the people to bear arms, whether in defence of themselves or of the State." *Journal of the Convention of the People of the State of Indiana to Amend the Constitution* 188 (Ind Hist Bureau 1936). After a second reading, a delegate asked whether the proposed wording was intended to permit or prohibit the wearing of concealed weapons. 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850* 1385 (1850). Another delegate responded that, if the drafters wished to reserve such power in the legislature, then they must revise the original wording of Article I, section 20, of the 1816 constitution;[21] "For if it were declared by Constitutional provision that the people should have the right to bear arms, no

---

[20] That provision was adopted without debate or amendment during Indiana's 1816 constitutional convention. Charles Kettleborough, 1 *Constitution Making in Indiana, 1780-1851* 88 n 5 (1971).

[21] We note that, in light of the Indiana Supreme Court's 1833 decision in *State v. Mitchell*, 3 Blackf 229 (Ind 1833), respecting the 1816 Indiana arms provision, that appears to have been an erroneous proposition.

law of the Legislature could take away that right." *Id.* Suggested amendments then were offered and rejected, to the following effect: (1) replacing the words "[n]o law shall restrict the right of the people" with "no law shall deprive the people of the right"; (2) inserting the words "in an open and unconcealed manner" respecting the bearing of arms; and (3) striking all words after "arms" (that is, all "defence" references). *Id.*

When the provision again came up for consideration, a delegate moved that it be amended to read as follows: "No law shall be passed restricting the right of the people to carry visible arms." *Journal of the Convention of the People of the State of Indiana to Amend the Constitution* at 580. As the minutes from the debate report it:

> "As the section now stood, [the delegate] thought that it gave a direct license to every desperado and ruffian in the State to carry concealed weapons. He did not think, however, that this was the opinion of the Convention, or that they would restrict the Legislature from passing any law for carrying concealed weapons."

2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850* at 1391. Another delegate then moved to strike the proposed wording and to insert the wording from Article I, section 20, of the Indiana Constitution of 1816, that is, that "the people have a right to bear arms for the defence of themselves and the State[.]" *Id.* According to the minutes, that delegate

> "was desirous whenever the words of the old Constitution were unobjectionable, and had received judicial construction, to retain them in the old form. He was opposed to the reported section from a fear it might possibly be so construed as to deprive the Legislature of power to prohibit the carrying of concealed weapons. The practice of carrying concealed weapons was one of the most dastardly, odious, and murderous practices that was ever tolerated in the civilized world, and unquestionably there was not a gentleman on that floor who would not feel shocked at the idea that no such prohibition could be passed."

*Id.* The proposed revision was recommitted for the purpose of replacing the proposed wording with the original 1816 wording. The convention eventually adopted the provision in that form as Article I, section 32. *Journal of the Convention of the People of the State of Indiana to Amend the Constitution* at 873.

The foregoing debate is helpful to our analysis here, because it demonstrates that the framers of the Indiana Constitution of 1851—while generally protective of the right to bear arms—nonetheless did not intend that the right extend so far as to preclude legislative regulation respecting the carrying of concealed weapons. Stated differently, in rejecting proposed wording that expressly prohibited legislative restriction, and in adopting the wording previously construed in *Mitchell*, the drafters of the Indiana Constitution of 1851 demonstrably did not intend to deprive the state legislature of the authority to regulate a particular aspect of the right to bear arms that related to public safety. That, in turn, supports this court's conclusion in *Kessler* that the guarantee set out in Article I, section 27, of the Oregon Constitution was subject to certain regulatory authority on the legislature's part—at the least, the authority to prohibit the carrying of concealed weapons and, possibly, a broader authority to act to prevent threats to public safety. However, the Indiana history does not conclusively demonstrate whether that regulatory authority extends to exclude certain groups of persons from the constitutional guarantee.

As to the basis of the arms provision of the Indiana Constitutional of 1816, we note that Indiana patterned that provision on the Ohio Constitution of 1802 and the Kentucky Constitution of 1792.[22] Robert Twomley, *The Indiana Bill of*

---

[22] Article VIII, section 20, of the Ohio Constitution of 1802 provided:

"That the people have a right to bear arms for the defence of themselves and the State; and as standing armies, in time of peace, are dangerous to liberty, they shall not be kept up, and that the military shall be kept under strict subordination to the civil power."

*Reprinted in* William F. Swindler, 7 *Sources and Documents of the United States Constitution* 555 (1978). Article XII of the Kentucky Constitution of 1792 provided, in part, "[t]hat the right of the citizens to bear arms in defence of themselves and the State shall not be questioned." *Reprinted in* Swindler, 4 *Sources and Documents* at 150.

*Rights*, 20 Ind LJ 211, 212 (1944). The Ohio and Kentucky provisions, in turn, likely were patterned on the Pennsylvania Constitution of 1790.[23] *See* Steven H. Steinglass and Gino J. Scarselli, *The Ohio State Constitution: A Reference Guide* 16 (2004); Robert M. Ireland, *The Kentucky State Constitution: A Reference Guide* 2 (1999). Pennsylvania, among other states, patterned its expression of the right to bear arms on the English Bill of Rights of 1689, which we discuss further below. *See Kessler*, 289 Or at 363-65 (discussing origins of right to bear arms).

The Kentucky Constitution of 1792 generated what appears to be the first appellate decision construing a state constitutional arms provision. Article XII of that constitution provided, in part, that "the right of the citizens to bear arms in defence of themselves and the State shall not be questioned." In 1822, the Kentucky Court of Appeals held that that provision prohibited legislation that criminalized the carrying of concealed weapons, reasoning that such legislation unconstitutionally restrained the citizenry's right to bear arms:

> "The right [to bear arms] existed at the adoption of the constitution; it had then no limits short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but in the liberty of the citizens to bear arms. Diminish that liberty, therefore, and you necessarily restrain the right; and such is the diminution and restraint, which the act in question most indisputably imports, by prohibiting the citizens wearing weapons in a manner which was lawful to wear them when the constitution was adopted. * * *

---

[23] Article IX, section 21, of the Pennsylvania Constitution of 1790 provided "[t]hat the right of citizens to bear arms, in defence of themselves and the State, shall not be questioned." *Reprinted in* Swindler, 8 *Sources and Documents* at 293.

Pennsylvania's declaration of the right to bear arms in its 1776 constitution appears to be the first such expression appearing in an organic document of one of the states. Bernard Schwartz, 1 *The Bill of Rights: A Documentary History* 262 (1971). That declaration provided:

> "That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."

*Reprinted in* Swindler, 8 *Sources and Documents* at 279.

> [I]n principle, there is no difference between a law prohib-
> iting the wearing of concealed arms, and a law forbidding
> the wearing such as are exposed; and if the former be
> unconstitutional, the latter must be so likewise."

*Bliss v. Commonwealth*, 2 Litt 90, 92, 12 Ky 90 (1822). The
people of Kentucky thereafter amended their constitution
expressly to allow prohibitions on the carrying of concealed
weapons. *See* Ky Const of 1850, Art XIII, § 25 ("[T]he rights of
the citizens to bear arms in defence of themselves and the
State shall not be questioned; but the general assembly may
pass laws to prevent persons from carrying concealed
arms.").[24]

The protective view of the state constitutional arms
guarantee expressed in *Bliss* is rare; to the contrary, most
courts addressing challenges to statutory restrictions have
concluded that state constitutional arms guarantees gener-
ally are subject to reasonable restraints. *See generally* John
Levin, *The Right to Bear Arms: The Development of the
American Experience*, 48 Chi-Kent L Rev, 148, 159 (1971) (so
noting).[25] Most significantly for our purposes here, as dis-
cussed above, the Indiana Supreme Court construed Article

---

[24] We note that there is no pre-1859 case law construing either the Ohio or
Pennsylvania constitutional provisions that later provided a basis for the Indiana
Constitution of 1816. The earliest Ohio case that we could locate issued in 1900 and
upheld a restriction on firearms possession by tramps. *See State v. Hogan*, 63 Oh St
202, 219, 58 NE 572, 575 (1900) (guarantee never intended as "warrant for vicious
persons to carry weapons with which to terrorize others"). The earliest relevant
Pennsylvania case that we could locate issued in 1875 and upheld a law criminal-
izing the act of maliciously carrying a concealed weapon with intent to harm
another. *See Wright v. Commonwealth*, 77 Pa 470 (1875) (act, which specified ele-
ment of malicious intent, prohibited conduct that was not protected by arms pro-
vision in Pennsylvania Constitution).

[25] The reasoning in such cases frequently is similar to that set out in *Robinson*,
217 Or 612, and *Cartwright*, 246 Or 120, that is, that the notion of the police power,
or some general state interest in the prevention of crime, permits reasonable
restraint of the right to bear arms. Other cases conclude that, because the right to
bear arms originally was intended to protect against an oppressive government,
reasonable restraints respecting the public peace and welfare do not contravene
the right. *See* John Levin, *The Right to Bear Arms: The Development of the
American Experience*, 48 Chi-Kent L Rev 148, 159 (1971) (discussing various
rationales and citing cases). It appears that every state court that has addressed a
challenge to legislation prohibiting felons from possessing firearms under a state
constitutional provision similar to Oregon's has upheld the legislation at issue. *See,
e.g., Baker v. State*, 747 NE2d 633, 637 (Ind App 2001) (holding, under police-power
rationale, that statute prohibiting possession of handgun by serious violent
offender was constitutional under Indiana's right to bear arms provision); *Eary v.*

I, section 20, of the Indiana Constitution of 1816—which was virtually identical to Article I, section 27, of the Oregon Constitution—to allow legislative prohibition of the wearing or carrying of concealed weapons. *Mitchell*, 3 Blackf at 229.[26]

As to the wording of the various state constitutional arms provisions in effect in 1859—all of which theoretically were available as resources to the drafters of the Oregon Constitution—we note that none of those provisions expressly prohibited felons or criminals from possessing arms. Further, none expressly demonstrated any intent respecting legislative authority to regulate the bearing of arms, although one—the Kentucky Constitution of 1850— expressly authorized the general assembly to regulate the carrying of concealed arms.[27] Notwithstanding the absence of

---

*Commonwealth*, 659 SW2d 198, 200 (Ky 1983) (holding that statute prohibiting felons from possessing handguns was constitutional under Kentucky's right to bear arms provision); *People v. Swint*, 225 Mich App 353, 374-75, 572 NW2d 666 (1997), *cert dismissed*, 459 Mich 931 (1998) (holding, under police-power rationale, that prohibiting felons from possessing firearms was not unconstitutional because statute did not completely foreclose right).

In that regard, we note that we agree with the observation that many of the cases construing state constitutional arms provisions "rarely refer to the specific language of their constitutions, and they often cite the provisions and court decisions of other states without noting differences in language and emphasis." Comment, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation*, 38 U Chi L Rev 185, 193 (1970). In light of that lack of detailed analysis, together with the emphasis on the outdated notion of the "police power" incorporated in many of the decisions, we find most of the decisions from other courts to be of little use to our analysis here.

[26] *Mitchell* was a one-sentence decision, declaring that the statute in question was not unconstitutional. 3 Blackf 229.

[27] *See* Ky Const, Art XIII, § 25 (1850) ("[T]he rights of the citizens to bear arms in defence of themselves and the State shall not be questioned; but the general assembly may pass laws to prevent persons from carrying concealed arms.") By 1900, six additional states had included preventative "concealed weapons" wording in their constitutional arms provisions. *See* Colo Const, Art II, § 13 (1987); La Const, Bill of Rts, Art III (1879); Miss Const, Art III, § 12 (1890); Mo Const, Art II, § 17 (1875); Mont Const, Art III, § 13 (1889); NC Const, Art I, § 24 (1876) (all setting out such wording).

Also by 1900, six other states had adopted constitutional provisions that expressly authorized legislative regulation of the right to bear arms. *See* Fla Const, Decl of Rts, § 20 (1885) ("The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."); Ga Const, Art I, § 1, XXII (1877) ("The right of the people to keep and bear arms, shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne."); Idaho Const, Art I, § 11 (1889) ("The people have the right to bear arms for their security and defense; but the Legislature shall regulate

express provisions, as discussed above, a number of state courts had construed their constitutional provisions to authorize such restrictions. Most significantly for our purposes here, the Indiana Supreme Court had construed its 1816 arms provision to allow legislative restrictions on the carrying of concealed weapons, notwithstanding the absence of any wording to that effect, and the 1850 Indiana constitutional convention delegates recognized the necessity for such a restriction when they incorporated the 1816 provision into the Indiana Constitution of 1851.

### b. *Oregon Territorial Laws and Statutes at Statehood*

Few statutes enacted by the Oregon territorial legislature or by the Legislative Assembly soon after statehood in 1859 related to the regulation of firearms. However, some statutes are helpful to our analysis as to whether the guarantee set out in Article I, section 27, carried with it legislative regulatory authority respecting the possession of arms as to certain groups of persons. *See generally Lakin v. Senco Products, Inc.*, 329 Or 62, 71-72, 987 P2d 463 (1999) (examining relevant territorial laws to discern framers' intent respecting particular constitutional provision); *Jory*, 153 Or at 294-96 (examining legislative actions at time of statehood as demonstrative of drafters' intent respecting legislature's constitutional power to increase salaries of governmental officials).

At the outset, we note that the right to bear arms was incorporated as part of the Organic Law of the Provisional Government, adopted by a vote of the people of Oregon in 1845. Article I, section 5, of the Organic Law provided, in part, that "[n]o person shall be deprived of the right of bearing arms in his own defence[.]" Organic Law of the

---

the exercise of this right by law."); Tenn Const, Art I, § 26 (1870) ("[T]he citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime."); Tex Const, Art I, § 23 (1870) ("Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime."); Utah Const, Art I, § 6 (1895) ("The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

Provisional Government of Oregon, Art I, § 5, pp 59-60 (Deady 1845-1864). No statute existing at statehood operated to restrict that right as to any groups of persons, including criminals, minors, vagrants, or the insane. Within the first years after statehood, the only statute that imposed a firearm restriction prohibited selling or giving any firearms or ammunition to any Native Americans without the authority of the United States. General Laws of Oregon, Crim Code, ch XLIX, § 654, pp 564-65 (Deady 1845-1864) (effective Oct 1864).[28]

In 1869, 10 years after the adoption of the Oregon Constitution, the legislature enacted a statutory right as to certain firearms for white male citizens, with no exceptions:

> "* * * Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defence, the following firearms, to wit: either or any one of the following named guns, and one revolving pistol: a rifle, shotgun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon.

> "* * * No officer, civil or military, or other person, shall take from or demand of the owner any firearms mentioned in this chapter, except where the services of the owner are also required to keep the peace or defend the state."

General Laws of Oregon, Misc Laws, ch XXII, §§ 1-2, p 613 (Deady & Lane 1843-1872) (effective Oct 1868). Relatedly, Oregon's early militia laws did not exempt felons or other ex-convicts from voluntary militia service. Laws of Oregon

---

[28] As defendants point out, at the time that the Oregon Constitution was adopted, Native Americans were not universally viewed as part of the American citizenry unequivocally protected by state and federal constitutional provisions. Rather, the extent of such constitutional protection—if any—depended on the existence and terms of particular treaties between the federal government and the various Native American tribes. *See generally United States ex rel. Mackey v. Cox*, 59 US (18 How) 100, 102-04, 15 L Ed 299, 300-01 (1855) (holding that Cherokee Nation is domestic territory, governed by own laws, but organized under and subject to United States Constitution and acts of Congress); *The Kansas Indians*, 72 US (5 Wall 737), 18 L Ed 667 (1866) (analyzing provisions of particular treaties to determine extent of constitutional protections afforded to various tribes and stating that Native Americans were not citizens of Kansas or subject to its laws). We therefore do not view early laws excluding Native Americans from any right to bear arms as significantly demonstrative of any intent on the framers' part respecting legislative authority to restrict other groups of persons from bearing arms.

1855-1856, 7th Regular Session (1855-56), An Act to Organize the Militia, pp 55-63 (setting out no exceptions to military service) (effective Jan 1856); Oregon Laws 1856-1858, 8th Regular Session (1856-57), An Act to Amend an Act Entitled "An Act to Organize the Militia," p 34 (effective Dec 1856) (exempting from militia service persons "subject to bear arms" under original militia law who are conscientiously opposed to bearing arms); General Laws of Oregon, Misc Laws, ch XXXVI, § 4, p 666 (Deady & Lane 1843-1872) (exempting persons exempt under federal law, ministers, various state officers, and clerks in telegraph offices, "and no other persons") (effective Oct 1862).

Most statutes that pertained to firearms at statehood or shortly thereafter were directed at prohibiting dueling and increasing punishment for crimes that involved the use of dangerous weapons. *See, e.g.*, General Laws of Oregon, Crim Code, ch XLIII, § 524, pp 530-31 (Deady 1845-1864) (crime to engage in, or to challenge someone to, duel with deadly weapon) (effective Oct 1864); *id.* at § 529, p 531 (assault and robbery while armed with dangerous weapon) (effective Oct 1864); *id.* at § 532, p 532 (assault while armed with dangerous weapon) (effective Oct 1864); Oregon Laws 1857-1858, 9th Regular Session (1858), An Act to prevent the escape of Penitentiary Convicts, pp 57-58 (death penalty to be imposed on territorial convict who, with deadly weapon, strikes, wounds, stabs, shoots, or shoots at penitentiary personnel or sheriff) (effective Jan 1858). The legislature did not act to prohibit the carrying of concealed weapons until 1885 and did not act to limit the possession of firearms by felons—or the possession of certain arms by any persons—until 1925. *See* Laws of Oregon 1885, An Act to prevent Persons from Carrying Concealed Weapons and to provide for the Punishment of the same, §§ 1-4, p 33 (enacting original statutory prohibition on carrying of concealed weapons); General Laws of Oregon 1925, ch 260, §§ 2, 5 (enacting predecessor statutes to *former* ORS 166.250 (1953) (ultimately held unconstitutional in *Kessler*, *Blocker*, and *Delgado*) and ORS 166.270).

As to the rights of felons or ex-convicts generally, the following provisions from Chapter LIII of the Criminal Code of 1864 are informative:

"§ 701. *A judgment of imprisonment in the penitentiary for any term less than for life, suspends all the civil rights of the person so sentenced,* and forfeits all public offices and all private trusts, authority or power during the term or duration of such imprisonment.

"§ 702. A person sentenced to imprisonment in the penitentiary for life, is thereafter deemed civilly dead.

"§ 703. The person of a convict sentenced to imprisonment in the penitentiary is under the protection of the law, and any injury to his person not authorized by law, is punishable in the same manner as if he was not convicted or sentenced.

"* * * * *

"§ 706. No conviction of any person for crime, works any forfeiture of any property, except in cases where the same is expressly provided by law; but *in all cases of the commission or attempt to commit a felony, the state has a lien, from the time of such commission or attempt, upon all the property of the defendant,* for the purpose of satisfying any judgment which may be given against him for any fine on account thereof, and for the costs and disbursements in the proceedings against him for such crime."

General Laws of Oregon, Criminal Code, ch LIII, §§ 701-703, 706, pp 575-76 (Deady 1845-1864) (effective Oct 1864) (emphasis added); *see also* Laws of Oregon 1858-1859, 10th Regular Session (1858-59), An Act to Amend an Act to create a Lien upon the Property of Criminals in certain cases, pp 43-44 (effective Jan 1859) (setting out enactment creating lien on property of "all persons who shall be convicted of any crime"). Thus, as to the rights of persons convicted of felonies, the first Oregon Criminal Code provided a distinction between those persons sentenced to the penitentiary for life (thereafter deemed "civilly dead") and those sentenced for less than life. As to that latter group—which presently would include "felons" as at issue here—imprisonment operated to suspend their civil liberties during the course of that imprisonment but not to terminate those liberties. Notably, that statutory provision made no exception respecting the bearing of arms. Further, although the state automatically had a lien on the property of such persons dating to territorial law, the

legislature soon after statehood exempted firearms from execution under the statutory guarantee, set out earlier, that granted all males older than 16 years the right to possess certain firearms. *See* General Laws of Oregon, Misc Laws, ch XXII, §§ 1-2, p 613 (Deady & Lane 1843-1872) (effective Oct 1868).

Additional territorial and early statutes, to some extent, addressed other topics relating to felons or ex-convicts. For example, an 1859 law disqualified persons convicted of felonies or misdemeanors involving moral turpitude from serving as jurors. Laws of the State of Oregon, First Extra Session, § 1 (1859), p 14. However, the original territorial laws did not prohibit felons or ex-convicts from voting. *See* An Act to Establish the Territorial Government of Oregon, 9 Stat 323, § 5 (1848), *reprinted in* General Laws of Oregon, p 54 (Deady & Lane 1843-1872).[29] Further, although the territorial and early state legislatures developed a comprehensive statutory framework governing operation of the state penitentiary and the monitoring of inmates, nothing in the statutes at statehood or shortly thereafter created any system for monitoring ex-convicts after their release from the penitentiary.[30] Rather, the only statutory provisions pertaining to the discharge of inmates concerned payment upon discharge. *See* General Laws of Oregon, Misc Laws, ch XLIV,

---

[29] 9 Stat 323, § 5 (1848) provided, in part:

"Every white male inhabitant, above the age of twenty-one years, who shall have been a resident of said territory at the time of the passage of this act, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election, and shall be eligible to any office within the said territory; but the qualifications of voters and of holding office, at all subsequent elections, shall be such as shall be prescribed by the legislative assembly; *Provided*, That the right of suffrage and of holding office, shall be exercised only by citizens of the United States above the age of twenty-one years, and those above that age who shall have declared, on oath, their intention to become such, and shall have taken an oath to support the constitution of the United States, and the provisions of this act[.]"

As noted earlier, Article II, section 3, of the Oregon Constitution of 1859 later disqualified felons from voting.

[30] *See* Laws of Oregon 1856-1857, 8th Regular Session (1856-57), p 12 (setting out act to provide for election and defining duties of penitentiary superintendent); Oregon Laws 1857-1858, 9th Regular Session (1857-58), pp 45-48 (act to provide for labor of penitentiary convicts) (effective Feb 1858); Laws of Oregon 1858-1859, 10th Regular Session (1858-59), pp 35-39 (act to more effectively provide for labor and safekeeping of penitentiary convicts) (effective Jan 1859); General Laws of

§§ 26-27, p 704 (Deady & Lane 1843-1872) ($5.00 paid to convicts upon discharge, plus $0.50 for each merit mark, subject to forfeiture for damages caused while incarcerated) (effective Oct 1864).

Finally, we note that, unlike the state of the law in colonial America (discussed below), early Oregon statutes imposed the death penalty for only first-degree murder and certain crimes committed during incarceration in the penitentiary. *See* Statutes of Oregon 1855, ch III, §§ 1-3, p 208 (death penalty for first-degree murder; imprisonment for second-degree murder); Oregon Laws 1857-1858, 9th Regular Session (1858), An Act to prevent the escape of Penitentiary Convicts, pp 57-58 (death penalty to be imposed on territorial convict who, with deadly weapon, strikes, wounds, stabs, shoots, or shoots at penitentiary personnel or sheriff) (effective Jan 1858); *see also generally* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich L Rev 204, 266 (1983) (felons at colonial times punished "with automatic forfeiture of all goods, usually accompanied by death"). As to the types of laws qualifying as felonies, Oregon's first criminal code identified certain crimes as felonies that did not involve any injury to person or property. *See, e.g.*, General Laws of Oregon, Crim Code, ch XLVI, §§ 616-18, p 554 (Deady 1845-1864) (felony to bribe Oregon voter or to receive such bribe) (effective 1864); General Laws of Oregon, Crim Code, ch V, §§ 632-35, p 429 (Deady & Lane 1843-1872) (felony to induce or persuade voter from another state to vote in Oregon or to induce Oregon voter to stay away from polls) (effective 1870).

In short, like the Oregon Constitution of 1859, the Oregon statutes in effect both before and shortly after statehood limited the rights of felons in some circumstances (*e.g.*, in suspending civil liberties while imprisoned and in disqualifying felons from serving on juries). However, nothing in those statutes expressly provided for the disarmament of felons after release from the penitentiary. Further, the statutes in effect at that time expressly protected arms possession,

---

Oregon, Spec Sess (Dec 1865), p 3 (act creating offices and providing for oversight of penitentiary) (effective Dec 1865); General Laws of Oregon, Misc Laws, ch XLIV, title II, §§ 19-25, pp 702-04 (Deady & Lane 1843-1872) (setting out early-release system based on merit marks) (effective Oct 1864).

both in prohibiting deprivation of the right generally and in guaranteeing the right of all white males over 16 years old to possess certain firearms.

### c. *English History*

As discussed above, Article I, section 27, shares a common historical background with other early state constitutional provisions that is rooted in the English understanding of the right to bear arms. This court discussed that history at length in *Kessler*, 289 Or at 363. Below, we summarize this court's discussion from *Kessler* and add further discussion that bears on the issue before us now.

Before the late seventeenth century, bearing arms in England was considered to be a duty, rather than a right. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 1 (1994). The Crown relied on citizen-soldiers to defend the country and to provide local law enforcement. Thus, the bearing of arms was part of a citizen's civic duty to defend himself and his family, property, neighbors, and community, as well as to serve in the militia. *Id.* at 2-3. Despite that duty, however, the Crown imposed numerous restrictions on arms ownership, as discussed below.

In the sixteenth century, when firearm use became more common, the Crown "attempted to place guns under special control," Malcolm, *To Keep and Bear Arms* at 9, by enacting statutes that "limit[ed] ownership and use of two concealable weapons frequently employed in crime, the handgun and the crossbow." *Id.*[31] The Crown also imposed other restrictions on firearm use, such as restricting shooting near towns and restricting the type of shot that could be used. *Id.* at 10. In the seventeenth century, Parliament often disarmed Catholics during times of religious tension, because it regarded them as potential subversives. *See id.* at 11. Similar acts of disarmament occurred during the reign of Charles II. *Id.* at 92.

In 1685, James II, a Catholic, acceded to the English throne. He established a strong standing army, which he

---

[31] Specifically, the statutes restricted possession of such arms based on a person's yearly income from land. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 9-10 (1994).

quartered in private homes, *Kessler*, 289 Or at 363-64, which traditionally had included criminals and societal outcasts, David B. Kopel, *It Isn't About Duck Hunting: The British Origins of the Right to Arms*, 93 Mich L Rev 1333, 1340-41 (1995) (citing Lois G. Schwoerer, "No Standing Armies!" *The Antiarmy Ideology in Seventeenth-Century England* 11, 22 (1974)).[32] James II also rigorously sought to disarm his subjects, with a particular aim toward disarming those who opposed his religious policies. He did so by strictly enforcing earlier firearms restrictions, including those set out in a series of game acts, which effectively disarmed those of little economic means,[33] and in the then-dormant 1328 Statute of Northampton, which forbade the carrying of arms in fairs and markets, among other things. *See* Malcolm, *To Keep and Bear Arms* at 102-04. In 1686, James II charged a former sheriff, who had fallen out of political favor, with wrongful use of a firearm under the dormant 1328 statute. A jury, however, acquitted the former sheriff, and the King's Bench "specifically recognized a 'general Connivance to Gentlemen to ride armed for their security.' " *Id.* at 104-05. In the words of Malcolm, the King's Bench "was not prepared to approve the use of [the 1328] statute to disarm law-abiding citizens." *Id.*

In his continued efforts to disarm the critics of the Crown—particularly Protestants—James II strictly enforced

---

[32] As one commentator noted:

" '[N]o pre-1789 society considered soldiering a calling for any but the few. War was rightly seen as too brutal a business for any except those bred to it by social position or driven to enlist by lack of any social position whatsoever; mercenaries and regulars alike, poor, jobless, *often criminally outcast, were judged fitted for war because peaceful life offered them nothing but equivalent hardship.*' "

Colonel Charles J. Dunlap, Jr., *Revolt of the Masses: Armed Civilians and the Insurrectionary Theory of the Second Amendment*, 62 Tenn L Rev 643, 647, 647 n 21 (1995) (quoting John Keegan, *A History of Warfare* 364 (1993) (emphasis added). Dunlap went on to write:

"It was obvious to the early Americans that a force so composed was vulnerable to nefarious exploitation by the leaders upon whom its existence depended. Quartering such soldiers in colonists' homes became yet another catalyst for the Revolution."

*Dunlap*, 62 Tenn L Rev at 647 n 21.

[33] In general, the game acts imposed property ownership qualifications as requirements for hunting and made it illegal for unqualified persons to use guns. Malcolm, *To Keep and Bear Arms* at 13.

the Militia Act of 1662, which permitted the disarmament of subjects at the militia officers' discretion. *See id.* at 115-16, 118; Kates, 82 Mich L Rev at 238-39 (quoting Militia Act, which empowered officials "to search for and seize all arms in the custody or possession of any person or persons whom [the officials] shall judge dangerous to the peace of the kingdom"). The Protestants revolted in 1688 in the "Glorious Revolution," deposed James II, and offered his Protestant daughter, Mary, and her husband, William of Orange, the Crown, on the condition that they sign a new Declaration of Rights. *Kessler*, 289 Or at 364. William then summoned a "Convention Parliament" to draft the declaration (discussed further below); William and Mary ultimately signed the Declaration of Rights of 1689, which was later enacted as a statute, *id.*, and which is commonly referred to as the Bill of Rights of 1689.

The Bill of Rights of 1689 listed the abuses of James II and declared the rights of the people in response to those abuses. *See* Malcolm, *To Keep and Bear Arms* at 117-18. In it, the convention transformed the "duty" to bear arms into a "right" of the people, by including a right-to-bear-arms provision.[34] The convention included that provision because of the outrage toward the Crown's disarmament of "law-abiding" and "good Subjects" during the seventeenth century as a political means to enhance the Crown. *Id.* at 115-18; *see also* Stephen P. Halbrook, *That Every Man Be Armed: The Evolution of a Constitutional Right* 45 (1st ed 1984) (setting out provision of English Bill of Rights that identified James II's disarmament abuses as follows: "By causing several *good Subjects*, being Protestants, to be disarmed * * *" (quoting English Bill of Rights, 1 W & M, 2d sess, ch 2 (1689) (emphasis added)). The arms provision of the Bill of Rights—

---

[34] In introducing her extensive research on the underpinnings of the English Bill of Rights of 1689, Malcolm explains that, although it purported to reaffirm an ancient common-law right, that document actually created a new right in declaring a right to bear arms. Malcolm, *To Keep and Bear Arms* at ix-x; *see also* Lucilius A. Emery, *The Constitutional Right to Keep and Bear Arms*, 28 Harv L Rev 473, 473 (1915) (noting that firearm restriction imposed in 1328 Statute of Northampton illustrated that "a right to keep and bear arms was not regarded [at that time] as a fundamental right of every Englishman").

which was limited to the Protestant targets of James II's disarmament policies—set out the right as follows:

> "that the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law."[35]

English Bill of Rights, 1 W & M, 2d sess, ch 2 (1689), *reprinted in* Bernard Schwartz, 1 *The Bill of Rights: A Documentary History* 43 (1971).

As noted, disarmament policies in sixteenth and seventeenth century England typically concerned political and religious dissidents, whom the Crown viewed as a threat, and subjects of little economic means. We have found no reference to any English laws at the time that operated specifically to disarm criminals; indeed, such persons participated in the standing armies that the Crown quartered in private homes. However, the Convention Parliament that adopted the Bill of Rights of 1689 noted their outrage toward the disarmament of "law-abiding" citizens and "good Subjects" (such as religious dissidents), suggesting that disarmament of lawbreakers was not necessarily an underlying concern that the Convention Parliament intended the arms guarantee to address. Further, as early as the sixteenth century, the Crown had imposed restrictions on arms typically used in crimes, and, according to some seventeenth-century English writings, those who had no interest in preserving the public peace had

---

[35] Scholars and commentators have debated the meaning of the "as allowed by law" clause, which the delegates added during the course of the convention and which appears to limit the nature of the right declared. *See, e.g.*, Malcolm, *To Keep and Bear Arms* at 120 (phrase implied that prior gun-ownership limitations imposed by pre-existing laws, such as the Game Act of 1671 and Militia Act of 1662 remained in place, which meant that "the arms article declared a right that current law negated, with the understanding that future legislation would eliminate the discrepancy"); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich L Rev 204, 237 (1983) (phrase could have been intended to specify that Protestants' newly declared right to arms was no greater than that which had pre-existed at common law; more likely, phrase meant that Crown, but not Parliament, was prohibited from disarming the citizenry). In view of the disagreement respecting the meaning of that phrase (which, in any event, focuses on circumstances unique to English history), and its subsequent absence from early American state constitutions and the Second Amendment to the United States Constitution, the presence of that limiting wording in the English Bill of Rights is not helpful to our analysis here.

difficulty obtaining arms. *See* Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp Probs 125, 130 (Winter 1986);[36] *see also* Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law*, 91 J Crim L & Criminology 829, 919 (2001) (noting that felons subject to current arms-possession restrictions "resemble the targets of vagrancy laws, who also were considered far too dangerous to possess a gun," citing *State v. Hogan*, 58 NE 572 (Ohio 1900)). Finally, "[w]ith arms readily available in their homes, Englishmen were theoretically prepared at all times to chase down felons in response to the hue and cry, or to assemble together as an impropmptu army in case of foreign invasion of their shire." Kates, 82 Mich L Rev at 214-15.

### d. *Colonial American History*

The American colonists believed that they retained all the same rights as Englishmen, including the right to bear arms. Malcolm, *To Keep and Bear Arms* at 138. In his *Commentaries on the Laws of England*, widely read and relied on as a source of law in the colonies, Malcolm, *To Keep and Bear Arms* at 142, William Blackstone wrote that the right to bear arms was required—together with other rights involving the administration of justice and the application for redress of injury—to secure the absolute, primary individual rights of personal security, personal liberty, and private property, *id.* at 143.[37]

Many early colonial statutes required the citizenry to arm itself, largely "for the defense of their isolated and

---

[36] Shalhope quotes the following sources: J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, and Absolutely Destructive to the Constitution of the English Monarch* 7 (London 1697) (arms were "never lodg'd in the hand of any who had not an Interest in preserving the publick Peace"); and 103 *Mercurius Politicus* 1610 (London, May 20-27, 1652) (arms should not be "in the hands of any but such as have an Interest in the Publick").

[37] Specifically, "[t]o vindicate these rights, when actually violated or attacked," Blackstone wrote that English subjects were entitled "in the first place, to the regular administration and free course of justice in the courts of law; next to the right of petitioning the king and parliament for redress of grievances; and lastly to the right of having and using arms for self-preservation and defence." Malcolm, *To Keep and Bear Arms* at 143 (quoting William Blackstone, I *Commentaries on the Laws of England*, 140 (1st ed, repr Chicago 1979)).

endangered communities." Levin, 48 Chi-Kent L Rev at 148; *see also id.* at 148-49 (setting out early colonial statutes requiring possession or carrying of arms); Emery, 28 Harv L Rev at 474-75 ("In the American colonies, with their small revenues and beset as they were with savage and other enemies, it was deemed necessary that every man of military age and capacity should provide himself with arms and be ready to bear them in defense of himself and his neighbors and the colony at large."). Additionally, as with community defense in England, the colonists were expected to "hunt[] criminals down when the hue and cry went up, and in more formal posse and militia patrol duties, under the control of public officials." Randy E. Barnett and Don B. Kates, *Under Fire: The New Consensus on the Second Amendment,* 45 Emory LJ 1139, 1217 (1996).[38]

Notably, however, the colonists did not treat the common-law right to bear arms as absolute and, instead, regulated firearm use and ownership. Such restrictions generally fell into three categories: (1) those prohibiting gun ownership or the carrying of arms by Native Americans and persons of African descent; (2) those prohibiting hunting or shooting near urban areas; and (3) those prohibiting the carrying or brandishing of arms so as to cause fear. *See* Kates, 82 Mich L Rev at 241 n 156); *see also* Malcolm, *To Keep and Bear Arms* at 140 (colonies restricted use of firearms in crowded places and prohibited riding with firearms with intent to terrify); Levin, 48 Chi-Kent L Rev at 149-50 (colonies tried to keep arms out of the "wrong hands" by forbidding slaves and Native Americans from carrying certain weapons and regulated firearms use to protect people and livestock).[39] It does

---

[38] We note that two other scholars recently have criticized Barnett and Kates for failing to offer a complete reading of the historical record respecting the American right to bear arms. *See* Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L Rev 487, 504 (2004) (criticizing work of Barnett and Kates). We further note, as explained below, that the acrimonious nature of much of the debate surrounding interpretation of the Second Amendment to the United States Constitution has resulted in similar cross-criticisms between other scholars and commentators. We have not relied in this opinion on any historical summaries that, in our determination, persuasively have been challenged in the academic arena.

[39] As to the early American prohibitions respecting arms ownership by persons of African descent, courts regularly upheld such restrictions based on the reasoning that such persons "could be denied the right to arms because they were

not appear, however, that any laws of the colonial era expressly prohibited criminals from owning firearms or otherwise provided for the disarmament of that group. Further, early colonial militia laws do not appear to have exempted criminals from the military ranks; indeed, such laws required that all who qualified for military service provide their own arms. *See, e.g.*, The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619, XII General Assembly of 1785, ch 1, § III, pp 10, 12 (all free male persons between 18 and 50 years of age, with exceptions based on occupation, required to report for militia service "armed, equipped, and accoutered") (Cochrand ed. 1823).

After the French and Indian War, which ended in 1763, the colonists no longer believed that they could rely on the English Bill of Rights. That war had brought many British troops to the colonies, and, following the war, George III maintained a standing army in American cities and ordered that the troops be quartered in private homes. The colonists viewed the standing army as an instrument of oppression and, therefore, drafted state constitutions during the Revolutionary War period that included arms provisions and that prohibited the keeping of standing armies during times of peace. *See Kessler,* 289 Or at 364-65; *see also* Malcolm, *To Keep and Bear Arms* at 143-47.

Following the adoption of those constitutions, the states continued to regulate firearm use and possession,

---

excluded by race from *all* privileges of citizenship." Kates, 82 Mich L Rev at 245-46 (emphasis in original) (citing *State v. Newsom,* 27 NC 250, 5 Ired 181 (1844); *cf. Cooper v. Mayor of Savannah,* 4 Ga 68 (1848) (persons of African descent were not citizens)). The United States Supreme Court adopted that same reasoning in *Dred Scott v. Sanford,* 60 US (19 How) 393, 417, 450, 15 L Ed 691 (1856), in opining that, if state legislatures were to consider persons of African descent to be American citizens, then they must accept that those persons enjoyed all rights of the citizenry, including "the full liberty of speech * * * and to keep and carry arms wherever they went." *See also* Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law,* 91 J Crim L & Criminlogy 839, 929 n 336 (2001) (setting out examples of pre-Civil War slave codes). In light of that distinction based on then-understood notions of citizenship, restrictions on arms ownership respecting persons of African descent (as well as Native Americans, as noted earlier) do not demonstrate a common understanding that the government constitutionally could disarm *other* groups of persons—such as felons or criminals.

including the types of regulations discussed earlier, *i.e.*, general disarmament of Native Americans and persons of African descent; prohibitions on the carrying of concealed weapons and the carrying of firearms in certain places; and prohibitions on carrying weapons with intent to terrorize the public.[40] Other regulatory laws at the time of the Revolutionary War concerned the use of firearms as part of militia service and the safe storage of gunpowder. *See generally* Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L Rev 508-12 (2004) (discussing such regulations).

Another type of arms restriction that emerged at the time of the Revolutionary War involved the disarmament of persons who refused to swear oaths of allegiance to a state or to the United States. *See id.* at 506-08 (discussing loyalty oaths). For example, the State of Pennsylvania—the constitutional arms provision of which likely was a genesis for Oregon's provision, *see* 338 Or at 646-47 (so explaining)—required any person who " 'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state" to "deliver up his arms to agents of the state" and thereafter was prohibited from "carry[ing] any arms about his person or keep[ing] any arms or ammunition in his 'house or elsewhere.' " Cornell and DeDino, 73 Fordham L Rev at 506 (quoting 1777-1778 Pa Laws, § 5, p 126). "Such a broad provision effectively eliminated the opportunity for someone to violently protest the actions of the Pennsylvania government or defend himself with a firearm." *Id.* Similarly, Massachusetts passed an act "that disarmed 'such Persons as are notoriously disaffected to

---

[40] *See* Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo Mason U Civ Rts LJ 67, 69-72, 79-80 (1991) (most southern states prohibited slaves and freed persons of African descent from possessing firearms; other states prohibited giving or selling firearms to Native Americans); William Weir, *A Well Regulated Militia: The Battle Over Gun Control* 37 (1997) (by 1850, every western state prohibited carrying concealed weapons; local authorities in West prohibited weapons within city limits); Cornell and DeDino, 73 Fordham L Rev at 501 (late eighteenth-century guidebooks used by justices of the peace, sheriffs, and constables of founding era stated that, under common law, such officials "were empowered to disarm individuals who rode about armed in terror of the peace"); *State v. Huntly*, 25 NC 418, 419-23 (1843) (offense of riding with dangerous weapons "to the terror of the people" is indictable); *see also Commonwealth v. Hope*, 39 Mass 1, 4-7, 22 Pick 1 (1839) (burglary at night armed with dangerous weapon punishable by death, but if not armed, punishable by hard labor for life).

the Cause of America, or who refuse to associate to defend by Arms the United American Colonies.'" *Id.* at 507 (quoting 1775-1776 Mass Acts, ch VII at 31). The Massachusetts law exempted Quakers by offering them a different form of declaration to accommodate their religion. Thus, as two authoring scholars put it, a Quaker's "right * * * to practice his religion outweighed the state's interest in its preferred test of allegiance," while the right to bear arms "did not outweigh the state's interest in maintaining security through disarmament of those considered dangerous to the state. Instead, the state's interest in public safety dominated." *Id.*

As to the early colonial and state militia laws, despite some commentators' assertions, we have been unable to locate any statutes that explicitly excluded criminals from membership in the militia;[41] to the contrary, early militia statutes that we have reviewed contained no exemption for felons or criminals, although they contained a litany of other exemptions. *See* 338 Or at 661-62 (discussing early Virginia statutes); Laws and Resolves of Massachusetts 1784-85, ch 55, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts (1785), pp 140, 151-52 (militia service required as to able-bodied men ages 16 to 60; exemptions based on occupation and status as "Quaker[ ], negro[ ], Indian[ ], and mulatto[ ]"); Laws of New York, ch 25, An Act to regulate the militia, pp 220, 225 (1786) (militia service required as to able-bodied men ages 16 to 45; exemptions based on occupation and Quaker status only).

Finally, we could find no reference to laws adopted before the drafting of the Oregon Constitution that

---

[41] *See* Stephen P. Halbrook, *That Every Man Be Armed: The Evolution of a Constitutional Right* 172 (1st ed 1984) (stating that "felons were always excluded from the militia"); Randy E. Barnett and Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 Emory LJ 1139, 1205 n 313 (1996) ("Under the colonial militia laws, every military-age male (excepting the insane, infirm, and criminals) was subject to the requirement to own arms for militia service and to bring arms when called out for drill, inspection, or actual military campaigning."). We note that the latter article refers to the United States Supreme Court's decision in *United States v. Miller*, 307 US 174, 59 S Ct 816, 83 L Ed 1206 (1939), in contending, among other things, that criminals traditionally were excluded from early state militias. However, nothing in *Miller*—which ultimately upheld an interstate firearms registration requirement under the reasoning that the Second Amendment pertains to the effectiveness of militia forces—supports that conclusion. *See* 307 US at 179-82 (discussing early colonial militia laws).

specifically prohibited groups such as felons from possessing firearms or other weaponry. We note, however, that scholars have written that colonial America often punished felonies by death, *see, e.g.*, Kates, 82 Mich L Rev at 266 (so stating), which early Oregon statutes did not do.

    e.   *Second Amendment to the United States Constitution*

The American colonial experience respecting the right to bear arms culminated in the adoption, in 1791, of the Second Amendment to the United States Constitution, which provides:

> "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[42]

We note, first, that most Second Amendment scholarship—as well as some recent federal case law—consists of a lively, even acrimonious, debate as to whether that amendment guarantees an individual right to bear arms (the more current prevailing academic view), a "collective" right that extends to only the states (the more traditional view), or some other "quasi-collective" or "civic" right. *See, e.g.*, *United States v. Emerson*, 270 F3d 203, 220, 260 (5th Cir 2001), *cert den*, 536 US 907 (2002); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 Law & Contemp Probs 151, 162 (Winter 1986); Kates, 82 Mich L Rev at 273 (all adopting or advocating individual-right view); *Silveira v. Lockyer*, 312 F3d 1052, 1060-61, 1086-87 (9th Cir 2002), *cert den*, 540 US 1046 (2003); David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 Yale LJ 551 (1991); Kenneth Lasson, *Blunderbuss Scholarship: Perverting the Original Intent and Plain Meaning of the Second Amendment*, 32 U Balt L Rev 127 (2003) (all adopting or advocating collective-right view); Cornell and DeDino, 73 Fordham L Rev at 491 (advocating "civic right" view, that is,

---

[42] The United States Supreme Court wrote in *Robertson v. Baldwin*, 165 US 275, 281, 17 S Ct 326, 41 L Ed 715 (1897):

"[T]he first ten Amendments to the Constitution * * * were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors."

a right "exercised by citizens, not individuals * * *, who act together in a collective manner, for a distinctly public purpose: participation in a well-regulated militia"). Much of that debate is not useful to our inquiry, because, as this court previously has recognized, Article I, section 27, of the Oregon Constitution guarantees an individual right. *See Kessler*, 289 Or at 371 ("[W]e hold that Article I, section 27, of the Oregon Constitution includes a right to possess certain arms for defense of person and property."). However, while we are mindful that that debate has shaped much of the research that is available to us in addressing the more particular question presented in these cases,[43] some of the available scholarship and commentary—which sheds light on the general American view of the right to bear arms in the late eighteenth century—bears on our analysis, as discussed below.

We begin by observing, as do many scholars, that a number of states proposed amendments to the original United States Constitution before its adoption in 1788—and 13 years before the ratification of the Bill of Rights—that would have guaranteed a right to bear arms. In particular, scholars often quote a proposed amendment from the dissent of the minority of the Pennsylvania ratifying convention as supporting the notion that the government constitutionally may disarm criminals. That proposed amendment provided:

> "That the people have a right to bear arms * * * and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals[.]"[44]

---

[43] Indeed, adherents to the collective-right view and quasi-collective or "civic right" view of the Second Amendment easily would conclude that felons constitutionally may be disarmed, because those adherents do not view the right as an individual one in any circumstance. *See, e.g.*, Cornell and DeDino, 73 Fordham L Rev at 496-99 (expressly rejecting notion that Second Amendment guarantees individual right to bear arms for personal protection).

[44] The full text of the proposed amendment provided:

"That the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to, and be governed by the civil powers."

*The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, 1787, reprinted in* Schwartz, 2 *Bill of Rights* at 665 (emphasis added). We agree that that proposed provision—had the framers adopted it—expressly would have permitted the disarming of criminals. However, other proposed amendments to the United States Constitution were not so explicit.

For example, the Massachusetts ratifying convention recommended an amendment that provided, "And that the said Constitution be never construed to authorize Congress * * * to prevent the people of the United States, *who are peaceable citizens,* from keeping their own arms[.]" *Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788* pp 78-92 (1856), *reprinted in* Schwartz, 2 *Bill of Rights* at 681 (emphasis added). Although we could view the reference to "peaceable citizens" as the equivalent of "law-abiding citizens" (thereby suggesting permissible disarmament of criminals), we just as easily could view that reference as a declaration that the colonial American citizenry—as opposed to the Native Americans who lived among them—were peaceable. New Hampshire also proposed an amendment, which provided that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion." Journal of the Proceedings of the Convention of the State of New Hampshire Whom Adopted the Federal Constitution* (1788), *reprinted in Miscellaneous Documents and Reports Relating to New Hampshire at Different Periods* 18 (1877), *reprinted in* Schwartz, 2 *Bill of Rights* at 761 (emphasis added). As with the "peaceable citizens" reference in the Massachusetts proposal, the phrase "Actual Rebellion" is ambiguous at best respecting any reference to common criminals; more likely, it referred to those involved in treasonist activities against the government.[45]

---

*The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, 1787, reprinted in* Schwartz, 2 *Bill of Rights* at 665.

[45] Virginia and New York also recommended that the government add a bill of rights to the federal constitution that included a right to bear arms. However, those proposals did not exclude explicitly criminals or nonpeaceable citizens. *See* Schwartz, 2 *Bill of Rights* at 842, 912.

In short, the collective wording of the early proposed—and defeated—amendments to the United States Constitution did not clearly confirm a general understanding among the founders that criminals or felons were excluded from any traditional right to bear arms or that the government otherwise constitutionally could disarm them.

As to the drafting of the Second Amendment itself, scholars generally agree that the framers viewed the constitutional arms guarantee as fundamental to their new form of government. Specifically, the framers viewed citizen arms possession as a critical check on governmental tyranny and as necessary protection against outlaws and enemy attack. *See, e.g.*, Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn L Rev 461, 467 (1995) ("With the citizenry armed, imposing tyranny would be far more difficult than it would be with the citizenry defenseless."); Shalhope, 49 Law & Contemp Probs 125 at 126 (one theme shaping framers' attitudes in late eighteenth century was "the vital interrelationship linking arms, the individual, and society"); David Thomas Konig, *The Persistence of Resistance: Civic Rights, Natural Rights, and Property Rights in the Historical Debate Over "The Right of the People to Keep and Bear Arms,"* 73 Fordham L Rev 539, 541 (2004) (American right to bear arms represented a right to "impos[e] the force of the community on those who * * * threatened its safety"); Barnett and Kates, 45 Emory LJ at 1216-17 (many founders thought that survival of republican government depended on the "armed freeholder * * * able to repulse outlaws and oppressive officials, * * * and foreign invaders"). [46] *But see*

---

[46] This court recognized that same principle in *Kessler*, 289 Or at 367:

"The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them."

(quoting Joseph Story, 3 *Commentaries on the Constitution*, 746 (1833) (internal quotations omitted)). Indeed, the efforts of the British government to disarm the colonists at the time of the Revolutionary War prompted the notion that a right to bear arms was necessary to secure liberty. *See* Journals of Congress (July 19, 1776), *printed in* Pennsylvania Gazette (July 24, 1776), *reprinted in* 5 *Journals of the Continental Congress, 1774-1789*, 592-93 (Worthington Chauncey Ford ed., 1906, repr 1968) (so demonstrating).

One writer also has noted the significance of the right to bear arms as to the fundamental American notion of division of governmental power. That is, in

Cornell and DeDino, 73 Fordham L Rev at 500-01 (in adopting "civic right" view of Second Amendment, authors rejected notion that self-defense concerns accompanied adoption of that amendment).

The framers of the United States Constitution "drew most fully upon a tradition of 'republicanism' " espoused by earlier European political philosophers such as Niccolo Machiavelli and James Harrington, and more contemporary political writers such as James Burgh. Shalhope, 49 Law & Contemp Probs at 126. In keeping with that tradition, the framers understood that the preservation of republican institutions "depended upon the continued existence of a 'virtuous' citizenry." *Id.* at 128. As defined by Machiavelli, Harrington, and Burgh, the "hallmark of virtuous republican citizenship" was the existence of a self-reliant citizenry that both possessed arms and was willing to use them "in defense of * * * person, * * * property, and * * * state." *Id.* at 130-31.

Second Amendment scholars and commentators have focused on that notion of a "virtuous citizenry" to conclude that, historically, the Second Amendment guarantee excluded convicted felons. As one commentator wrote:

> "[T]he [individual right] interpretation of the Second Amendment does not guarantee a right to keep and bear arms for everyone. The right to arms always extended beyond the core membership of the militia, encompassing those (like women, seamen, clergymen, and those beyond the upper age for militia service) who could not be called out for militia duty. But [individual right] scholars tend to stress that[,] in
>
>> " 'classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the "virtuous citizen." Free and republican institutions were believed to be dependent on civic *virtu* which, in turn, depended upon each citizen being armed—and, therefore, fearless, self-reliant, and upright. Since possession of arms was the hallmark of

---

addition to dividing power within the federal government among the three branches, and further generally dividing governmental power between the federal and state governments, "it is fair to say that the Framers divided power yet another way, by ensuring that the citizenry possessed sufficient military power to offset that of the Federal government." Reynolds, 62 Tenn L Rev at 469.

> citizen's independence, the ultimate expression of civic *virtu* was his defensive use of arms against criminals, oppressive officials, and foreign enemies alike. *One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue.'*"

Reynolds, 62 Tenn L Rev at 480 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp Probs 143, 146 (Winter 1986)) (internal citations and footnotes omitted; emphasis added).

The excerpt set out above suggests that, in light of the political theories that guided the framers of the United States Constitution and the Bill of Rights, the framers never intended felons to obtain the benefit of the Second Amendment guarantee because they did not qualify as "virtuous citizens." Indeed, we have not found a scholar or commentator addressing the topic who disagrees with that general conclusion. We note, however, that the articles that we have reviewed offer little by way of concrete historical example to support that conclusion, other than generally invoking the notion of "virtuous citizenship." For example, one commentator writes:

> "The constitutionality of * * * legislation [prohibiting firearms possession by felons] cannot seriously be questioned on a theory that felons are included within 'the people' whose right to arms is guaranteed by the [S]econd [A]mendment. Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in jails awaiting trial on criminal charges were also debarred from the possession of arms. Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent."

Kates, 82 Mich L Rev at 266; *see also* Kates, 49 Law & Contemp Probs at 146 (to same effect). Unlike the rest of that

author's lengthy article analyzing the federal constitutional right to bear arms, the above-quoted excerpt bears no citation to any historical authority. Further, as discussed earlier in this opinion, only one of the "ratifying convention proposals" that the author mentions—far from all—expressly would have excluded common criminals and felons from the right to bear arms.[47]

In sum, in light of the lack of definitive examples from the historical record, we find much of the conclusory scholarship respecting the right of felons to possess arms under the Second Amendment to be unhelpful. Other material, however, provides us with a clearer picture of the scope of the framers' view of the notion of a "virtuous citizen." For example, some scholars point to the writings of Cesare Beccaria, an Italian philosopher whose work proved influential to Thomas Jefferson and John Adams, and of Thomas Paine. Beccaria was fiercely opposed to the notion of disarming the general populace, for fear of the now-common adage that, "when guns are outlawed, only outlaws will have guns." Barnett and Kates, 45 Emory LJ at 1215.[48] Similarly, Paine

---

[47] That problematic lack of historical support persists in other articles concluding that the framers intended to exclude felons outright from the Second Amendment guarantee. For example, after discussing the notion of the virtuous citizen, another commentator relied on the writings from Kates, set out and cited in the text above, to conclude:

"Thus, felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise—though some (women for example) who lacked the right to vote nonetheless possessed the right to arms."

Reynolds, 62 Tenn L Rev at 480 (internal footnotes omitted). Similarly, another author inaccurately cites Thomas M. Cooley's 1903 *Treatise on Constitutional Limitations* as support for the proposition that "Colonial and English societies of the eighteenth century * * * excluded infants, idiots, lunatics, and felons" from possessing arms in their defense. *See* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?* 36 Okla L Rev 65, 96, 96 n 147 (1983) (citing T. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 57 (7th ed 1903), which generally states that certain classes almost universally have been excluded from the right of *franchise*, including "the idiot, the lunatic, and the felon, on obvious grounds").

[48] Beccaria wrote:

"False is the idea of utility that sacrifices a thousand real advantages for one imaginary or trifling inconvenience; that would take fire from men because it burns, and water because one may drown in it; that has no remedy for evils, except destruction. The laws that forbid the carrying of arms are laws of such a nature. They disarm those only who are neither inclined nor determined to

wrote that "[a]rms like laws discourage and keep the invader and the plunderer in awe, and preserve order in the world as well as property. * * * To protect themselves, responsible citizens must arm themselves." Shalhope, 49 Law & Contemp Probs at 129. Further, an early constitutional scholar, William Rawle, wrote that, although the Second Amendment could not "be conceived to give congress a power to disarm the people," the right to bear arms "ought not, however, in any government, to be abused to the disturbance of the public peace." Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?* 36 Okla L Rev 65, 84-85 (1983) (quoting William Rawle, *A View of the Constitution of the United States of America* 125-26 (Phil 1825)). Finally, in emphasizing the notion of the "virtuous citizen," one commentator has written that the founders "learned to conceive of tyrants as felons whom the virtuous citizen should resist just as he would resist any other species of robber." Kates, 49 Law & Contemp Probs at 145-46 n 16.

Those guiding philosophies demonstrate the general view of the framers of the Second Amendment that a certain criminal element—notably, "outlaws" using weapons or otherwise committing injurious crimes against person and property—occupied a lesser status in the community than the responsible, law-abiding citizenry, particularly respecting the bearing of arms. *See also* Dowlut, 36 Okla L Rev at 70 (stating that "[t]he necessity of self-defense against criminal attacks was also a reason for keeping and bearing arms" and citing 1697 complaints that Philadelphia "was becoming invested with pirates and rogues" and was "overrun with

---

commit crimes. Can it be supposed that those who have the courage to violate the most sacred laws of humanity, the most important of the code, will respect the less important and arbitrary ones, which can be violated with ease and impunity, and which, if strictly obeyed, would put an end to personal liberty—so dear to men, so dear to the enlightened legislator—and subject innocent persons to all the vexations that the quality alone ought to suffer? Such laws make things worse for the assaulted and better for the assailants; they serve rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man. They ought to be designated as laws not preventive but fearful of crimes, produced by the tumultuous impression of a few isolated facts, and not by thoughtful consideration of the inconveniences and advantages of a universal decree."

Barnett and Kates, 45 Emory LJ at 1215 (quoting *The Commonplace Book of Thomas Jefferson* 314 (G. Chinard ed., 1926) (quoting Cesare Beccaria, *An Essay on Crimes and Punishments* 87-88 (1764)).

wickedness" (internal quotation marks omitted)). At the same time, the citizenry's bearing of arms was necessary to repel crimes of that nature.

Finally, we note that the United States Supreme Court has upheld federal legislation prohibiting felons from possessing firearms against a Second Amendment challenge. *See Lewis v. United States*, 445 US 55, 66, 100 S Ct 915, 63 L Ed 2d 198 (1980) ("Congress could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm"; "This Court has recognized repeatedly that a legislature constitutionally may prohibit a convicted felon from engaging in activities far more fundamental than the possession of a firearm," citing cases involving disenfranchisement, the holding of public office, and professional licensing). However, the Court reached that conclusion in the context of an earlier holding that the Second Amendment "guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.' " *Id.* at 65 n 8 (quoting *United States v. Miller*, 307 US 174, 178, 59 S Ct 816, 83 L Ed 1206 (1939)). Consequently, the court's particular construction of the Second Amendment in *Lewis*—which, unlike this court's construction of Article I, section 27, in *Kessler*, exclusively focused on the military use of arms—is not instructive to our analysis here.[49]

4. *Summary*

The foregoing discussion demonstrates that certain aspects of the text, case law, and historical circumstances surrounding Article I, section 27, are, at times, in tension with one another and may suggest different answers to the question whether the Oregon Legislative Assembly has constitutional authority to prohibit felons from possessing firearms. Recognizing that that tension complicates our task in these cases, we summarize below the aspects of the text, case

---

[49] We reiterate that the more recent, prevalent academic view is that the Second Amendment appears to protect an individual right to bear arms, as well as a right related to militia service. *See* 338 Or at 665-66 (discussing conflict among Second Amendment scholars and commentators). The Supreme Court has not addressed that issue since deciding *Lewis* in 1980.

law, and historical circumstances that are most illustrative and, ultimately, point us to the intended meaning of Article I, section 27.

The first—and, indeed, primary—aspect of our analysis is the text of Article I, section 27, itself, considered together with other relevant contextual constitutional provisions. As discussed, that text, viewed in isolation, appears to be absolute, in referring to a right of "the people," without exception. Conversely, other provisions of the Oregon Constitution of 1859 either expressly excluded felons from the exercise of a constitutional right or expressly granted the legislature authority to regulate activity delineated in the Bill of Rights.

Further, Oregon's laws at or shortly after statehood portray a tradition of arms possession by the citizenry. As discussed, those laws provided no mechanism or authority for disarming felons or other citizens deemed to be undeserving of arms possession. To the contrary, Oregon law expressly provided that a felon's civil rights were merely "suspended" during any period of incarceration less than life, and Oregon's early militia laws contained no exceptions for felons, ex-convicts, or any other category of criminal. We also think it significant that, unlike the frequent practice during colonial times, Oregon traditionally did not impose the death penalty for most felonies; by contrast, the death penalty was imposed for only first-degree murder or certain crimes committed in the penitentiary. Consequently, since statehood, Oregon has had a community of convicted felons living within its borders, many of whom have committed dangerous crimes. Nonetheless, as noted, Oregon did not have any express mechanism for disarming that community when the people adopted Article I, section 27, as part of the Oregon Constitution in 1859.

Our inquiry, however, is not limited to the text of Article I, section 27, or even to the Oregon historical circumstances alone; rather, we also must consider this court's case law construing Article I, section 27, and the broader historical circumstances that surround that provision. *See Kessler*, 289 Or at 363-68 (scope of Article I, section 27, is shaped by broader historical experiences of sixteenth and seventeenth

century England and colonial America); *see also generally DeMendoza v. Huffman*, 334 Or 425, 437-43, 51 P3d 1232 (2002) (in analyzing remedy clause from original Oregon Constitution, court considered historical understanding of punitive damages dating to eighteenth-century English practice); *Rogers*, 330 Or at 298-99 (in analyzing criminal defendant's "right to be heard" under original Oregon Constitution, court explained historical state of law at time of adoption of early state constitutions on which Oregon's provision was based). And, as discussed below, several aspects of the case law and the broader historical background demonstrate that those who drafted Oregon's constitution recognized that the American citizenry's right to bear arms—as inherited from England—was not absolute.

As to the case law, this court explained in *Kessler* and *Blocker* that, notwithstanding the absence of express wording to that effect, Article I, section 27, allows some legislative regulation respecting the right to bear arms for defensive purposes. *See Blocker*, 291 Or at 259 (citing *Kessler* for proposition that legislation that restricts manner of possession or use of certain weapons constitutionally may be permissible under Article I, section 27). That case law is consistent with the debate surrounding the Indiana Constitution of 1851, on which the Oregon drafters based this state's constitutional arms provision, which demonstrates that the drafters intended to preserve the legislature's authority to prohibit the carrying of concealed weapons. That debate respecting concealed weapons in turn acknowledged the state's role in ensuring public safety, which we consider together with the wording of the constitutional guarantee.

Turning to the broader historical background, we first reiterate the purpose of the English right to bear arms set out in the Bill of Rights of 1689, which served as the origin for the American right. As discussed earlier, the drafters of that document were primarily concerned with the Crown's disarming of religious dissidents, who were "law-abiding" citizens and "good Subjects," through application of the Militia Act of 1662. Nothing in the history of the English right suggests that the drafters of the English Bill of Rights intended the arms provision to preclude the disarmament of serious lawbreakers; indeed, the refusal of the King's Bench in 1686

to enforce firearms restrictions against law-abiding citizens reinforces that reading of the history. That, in turn, counters any notion that the traditional right to bear arms inherited from England provided an absolute guarantee to those who violate criminal laws.

We find another important aspect of the history of the American right to bear arms, as inherited from England, in the political philosophies of the American founders and the framers of the Second Amendment. The founders indisputably viewed the right to bear arms as fundamental to a free society, because it provided a mechanism whereby the people could act to prevent oppression and tyranny and also to protect their principal rights of personal security, personal liberty, and private property. On one hand, nothing that we have found in the Second Amendment scholarship suggests that colonial society categorically would have excluded felons, or any other type of lawbreaker, for that matter, from communal efforts to ward off tyranny or other forms of enemy attack. Indeed, as we have noted, early colonial and state militia laws did not exempt any type of lawbreaker from required militia service. On the other hand, protection of the principal rights of personal security, personal liberty, and private property required the bearing of arms against those who sought to violate those rights—including criminals and those having no interest in preserving the public peace. Shalhope, 49 Law & Contemp Probs at 130-31.

Relatedly, the political view of the "virtuous citizen," also prevalent at the time of the founding, suggested that the right to bear arms carried with it the responsibility for upstanding citizenship, which in turn required the willing taking up of arms both to hunt down and to defend against those who threatened the safety of the community. Under that view, as many scholars and commentators have concluded, upon violating the social compact between the citizenry and society—and, simultaneously, the duty to act as a virtuous citizen—by committing serious crime, the lawbreaker's right to bear arms is subject to restriction.

A final significant aspect of the history surrounding Article I, section 27, is the historical practice—both in England and in colonial America—respecting the regulation

of the bearing of arms and the use of arms to defend against criminal activity. As discussed, those societies generally directed such regulations toward public safety concerns— such as restrictions extending to those who posed a threat to the public peace or who were perceived to pose such a threat, and other prohibitions on the carrying of concealed weapons and the carrying of weapons or shooting of weapons in towns or crowded areas. Further, the loyalty oath requirements in place in Pennsylvania in the late eighteenth century demonstrated that, at that time and in those circumstances, the community's security outweighed any right to bear arms set out under a state constitutional provision that provided a genesis for Oregon's provision. Finally, in both seventeenth-century England and in colonial America, society viewed the criminal element as a segment of the population that the law-abiding citizenry was obliged to hunt down and bring to justice, so as to protect oneself and one's community.

After reviewing and considering all the foregoing materials, we reach the following conclusions. First, when the drafters of the Oregon Constitution adopted and approved the wording of Article I, section 27, they did not intend to deprive the legislature of the authority to restrict arms possession (and manner of possession) to the extent that such regulation of arms is necessary to protect the public safety. Second, and more significantly for our purposes here, Article I, section 27, does not deprive the legislature of the authority (1) to designate certain groups of persons as posing identifiable threats to the safety of the community by virtue of earlier commission of serious criminal conduct and, in accordance with such a designation, (2) to restrict the exercise of the constitutional guarantee by members of those groups.

That is not to say, however, that the legislature's authority to restrict the bearing of arms is so broad as to be unlimited. Rather, any restriction must satisfy the purpose of that authority in the face of Article I, section 27: the protection of public safety. It follows that, although it has broad authority under that provision to assess the threat to public safety that a particular group poses, the legislature is not free to designate any group without limitation as one whose membership may not bear arms. Instead, such a designation

must satisfy the permissible legislative purpose of protecting the security of the community against the potential harm that results from the possession of arms.

The foregoing conclusion is consistent with the historical underpinnings of the right to bear arms as discussed in this opinion. It also is consistent with the early American arms restrictions and certain early practices in Pennsylvania and Massachusetts of disarming particular persons who threatened the state's interest in maintaining security: The common thread among all those restrictions was their objective of protecting the public from identifiable threats to the public safety, such as serious criminal conduct and various harms resulting from the possession of arms (*e.g.*, shooting within town limits). And, as to those traditional restrictions extending to particular groups of persons, it was understood that the authority to designate a group posing such a threat fell within the legislative purview. Nothing in the historical record suggests that, when they drafted Article I, section 27, the framers of the Oregon Constitution held any contrary understanding respecting the legislature's authority to designate certain groups as posing identifiable threats to the public safety by virtue of the earlier commission of serious criminal conduct.

## C.   *ORS 166.270(1) is not Unconstitutionally Overbroad*

The final question in these cases is whether, in light of the foregoing analysis, ORS 166.270(1) is unconstitutionally overbroad because it impinges in some circumstances on conduct that Article I, section 27, protects. As explained below, we conclude that it is not.

In devising Oregon's Criminal Code, the legislature adopted the familiar term from the common law, "felony," to describe the class of crimes that represent the most serious kinds of antisocial behavior. The legislature punishes felonies only as the result of a criminal prosecution, and it has authorized the imposition on convicted felons the most serious punitive sanctions in the legislative arsenal, ranging up to long-term imprisonment and death. It is undeniable that a felony conviction, by contrast to guilt determinations and adjudications for lesser crimes, offenses, and administrative violations, carries a markedly greater punitive significance

in the eyes of the community and, typically, a far broader range of negative collateral consequences. Those characteristics demonstrate that conviction of a "felony" signifies a breach of society's most essential rules for obligatory conduct—rules that are central to the legislative task of protecting the public from violence and various forms of abuse.

The foregoing leads us to conclude that, in enacting ORS 166.270(1), the legislature acted within its proper authority to restrict the possession of arms by the members of a group whose conduct demonstrates an identifiable threat to public safety. It follows that ORS 166.270(1) is not unconstitutionally overbroad, as defendants contend.

## IV. CONCLUSION

For the reasons set out above, we hold that ORS 166.270(1) is not unconstitutionally overbroad on its face under Article I, section 27, of the Oregon Constitution. Accordingly, the trial courts did not err in overruling defendants' demurrers to their indictments.

The decisions of the Court of Appeals and the judgments of the circuit court are affirmed.